# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MATTHEW SANCHEZ and

TIANNA SANCHEZ

Write the full name of each plaintiff.

-against-

COUNTY OF DUTCHESS; BENJAMIN DOTY;

GLEN BROWN; CANDACE LYNCH;

HON. JOSEPH EGITTO and

HON. CASEY MCCABE.

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

17 CV 6597

(Include case number if one has been assigned)

## SECOND AMENDED COMPLAINT

Do you want a jury trial?
☑ Yes  ☒ No

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/2/18

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.



RECEIVED
JAN 02 2018
U.S.D.C.
WP

Rev. 1/9/17

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  **Federal Question**

☐  **Diversity of Citizenship**

## A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
VIOLATION OF CONSTITUTIONAL RIGHTS

VIOLATION OF FIRST AMENDMENT OF U.S CONSTITUTION

VIOLATION OF FOURTEENTH AMENDMENT OF U.S CONSTITUTION

## B.   If you checked Diversity of Citizenship

### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , _____ , is a citizen of the State of
(Plaintiff's name)

_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____ .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Matthew and Tianna | | Sanchez |
|---|---|---|
| First Name | Middle Initial | Last Name |

| Po Box 528 |
|---|
| Street Address |

| Dutchess,Glenham | NY | 12527 |
|---|---|---|
| County, City | State | Zip Code |

| 8455979320 | sanchz777@aol.com |
|---|---|
| Telephone Number | Email Address (if available) |

Page 3

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

| County of Dutchess | |
|---|---|
| First Name | Last Name |

Current Job Title (or other identifying information)

50 Market Street

Current Work Address (or other address where defendant may be served)

| Dutchess, Poughkeepsie | NY | 12602 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

| BENJAMIN | DOTY |
|---|---|
| First Name | Last Name |

SRPTLM

Current Job Title (or other identifying information)

21 Dutchess Ave

Current Work Address (or other address where defendant may be served)

| Dutchess, Millerton | NY | 12546 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

| GLEN | BROWN |
|---|---|
| First Name | Last Name |

Probation Officer

Current Job Title (or other identifying information)

50 Market Street

Current Work Address (or other address where defendant may be served)

| Dutchess, Poughkeepsie | NY | 12601 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 4:

**CANDACE**      **LYNCH**

First Name          Last Name

**Case Manager II**

Current Job Title (or other identifying information)

**60 Market Street**

Current Work Address (or other address where defendant may be served)

**Dutchess, Poughkeepsie**     **NY**       **12601**

County, City                State        Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: **See Attachment.**

Date(s) of occurrence: **See Attachment.**

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

See Attachment.

Page 5

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

See Attachment.

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 01/02/18 | | |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Matthew & Tianna | | Sanchez |
| First Name | Middle Initial | Last Name |
| PO Box 528 | | |
| Street Address | | |
| Dutchess, Glenham | NY | 12601 |
| County, City | State | Zip Code |
| | sanchz777@aol.com | |
| Telephone Number | Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes  ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

**ATTACHMENT A**
ADDRESSES OF ALL DEFENDANTS

1. COUNTY OF DUTCHESS
60 Market Street
Poughkeepsie, NY 12601


2. BENJAMIN DOTY
Police Officer with County of Dutchess
Millerton Police Department
21 Dutchess Ave
Millerton, NY 12546

3. GLEN BROWN
County of Dutchess Office of Probations & Community Corrections
50 Market Street
Poughkeepsie, NY 12601


4. CANDACE LYNCH
Country of Dutchess Department of Community and Family Services-Child Protective
Services
60 Market street
Poughkeepsie, NY12601


5. HON. JOSEPH EGITTO
60 Market Street
Poughkeepsie, NY12601


6. HON. CASEY MCCABE
19 N Maple Ave
Millerton, NY 12546

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MATTHEW SANCHEZ and TIANNA
SANCHEZ,

     Plaintiffs,

     v.

COUNTY OF DUTCHESS, BENJAMIN
DOTY, as police officer with County of
Dutchess and in his individual capacity;
GLEN BROWN, as probation officer with
County of Dutchess Office of Probations &
Community Corrections and in his
individual capacity; CANDACE LYNCH,
as CPS investigator with Country of
Dutchess Department of Community and
Family Services-Child Protective Services
and in her individual capacity; HON.
JOSEPH EGITTO and HON. CASEY
MCCABE,

     Defendants.

Case No.:


SECOND AMENDED
COMPLAINT

## INTRODUCTION

1. Plaintiffs Matthew and Tianna Sanchez ("Plaintiffs" or "Sanchezes"), proceeding Pro Se,

   bring this action against defendants County of Dutchess Police Officer Benjamin Doty

   ("Police Officer Doty"), County of Dutchess Department of Probations & Community

   Corrections Officer Glen Brown ("Probation Officer Brown"), and CPS Investigator for

   Country of Dutchess Department of Community and Family Services-Child Protective

   Services Candace Lynch ("CPS Worker Lynch"), who have violated Plaintiffs' constitutional

   rights as parents to the care, custody and nurture of their children, and Plaintiffs'

   constitutional rights for freedom of religion.

2. The right of Plaintiffs to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.

3. In addition, State Judges have the responsibility to respect and protect persons from violations of federal constitutional rights. The Family Court Judge, Hon. Joseph Egitto, and the Criminal Court Judge, Hon. Casey McCabe, who have been presiding over the Plaintiffs' state proceedings have not only failed to protect Plaintiffs' federal constitutional rights as parents but have also gravely violated Plaintiffs constitutional rights by using excessive judicial power and improper judicial rulings.

4. Plaintiffs therefore bring suit under 42 U.S.C. s. 1983 against defendants for violation of their federal constitutional rights.

5. Plaintiffs asks this court to enjoin Defendants' unlawful conduct and return of custody of their children. In addition, Plaintiff seeks compensatory and punitive damages, as well as recoupment of their legal costs.

## I.  JURISDICTION and VENUE

6. Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

7. As Defendants regularly do business or reside within the Southern District of New York, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Additionally, the acts that form the basis of this lawsuit occurred within this jurisdiction.

## II.  PARTIES

### A. Plaintiff

8. Matthew and Tianna Sanchez are married and reside in County of Dutchess, New York. They are parents of four minor children. Because of Defendants' improper and unlawful actions,

Plaintiffs were deprived of their fundamental right to care and companionship of their children in violation of Sanchezes First and Fourteenth Amendments of the U.S. Constitution.

**B.  Defendants**

9.  County of Dutchess, through its agencies and departments, is the employer of Police Officer Doty, Probation Officer Brown and CPS Worker Lynch. County of Dutchess has failed to properly train and supervise Police Officer Doty, Probation Officer Brown and CPS Worker Lynch, resulting in inaccurate and misleading police, probation and CPS reports and work that caused Plaintiffs to unlawfully lose custody of their infant children.

10. Benjamin Doty is the Police Officer with County of Dutchess whose improper and unlawful actions in mishandling the preparation of the police report on his visit to the Sanchezes' home resulted in the violation of Plaintiffs' liberty interest of retaining custody of their children.

11. Glen Brown is the Probation Officer with County of Dutchess Department of Probations & Community Corrections whose improper and unlawful actions in grossly mishandling his work with one of Plaintiffs' children resulted in violation of Plaintiffs' liberty interest of retaining custody of their children.

12. Candace Lynch is the CPS worker with Country of Dutchess Department of Community and Family Services-Child Protective Services whose improper and unlawful actions in grossly mishandling the Sanchez children's removal case by conveying misleading information to the family court resulted in violation of Plaintiffs' liberty interest of retaining custody of their children. Also, CPS Worker Lynch's efforts to arrange for the removal of the children from

their home were apparently based at least in part on her distaste for Plaintiffs' religious beliefs which is in violation of their First Amendment rights.

13. Hon. Joseph Egitto is a Dutchess Family Court Judge. Judge Egitto presides over Plaintiffs' family court proceedings and he has grossly mishandled Plaintiffs' family court case. By using excessive judicial power and overreaching, he has violated Plaintiffs' constitutional rights.

14. Hon. Casey McCabe is North East Town Criminal Court Judge. Judge McCabe has grossly mishandled plaintiffs criminal court case. She has violated Plaintiffs' constitutional rights by allowing the criminal case to proceed against them without the proper paperwork (i.e. criminal complaint file that is legally insufficient), for the charges brought, being filed by the District Attorney.

## III.    STATEMENT OF FACTS

### Background

15. Plaintiffs, Matthew and Tianna Sanchez, are the parents of four minor children, S.H., D.H., T.H., and N.S., the first three children being Matthew Sanchez's step-children.

16. Plaintiffs have always provided adequate food, discipline, shelter, and emotional caretaking for all four of their children. At all times, the children were well groomed, clothed, and in good physical health.

17. For some time, D.H., aged 12, has had severe anger management issues, and he has frequently acted inappropriately towards his siblings and his parents.

18. T.H have reported to the Plaintiffs on many occasions that he was scare of D.H. and he is scared of his sibling because D.H. would make him do things and say things he didn't want to. D.H. has even hit T.H., N.S. and S.H. He has intimidated them and threaten them. Also, S.H.

has done the same to T.H and N.S.  Officer Brown, CPS Worker Lynch, other CPS workers, such as Taylor from the Children's Home, were fully aware of these threats and acts by D.H and S.H.

19. D.H. has also had many altercations at school.

20. D.H. has been suspended from school many times.

21. D.H. has admitted to Tara Hart, the social worker at his school, that he had falsely told the school librarian that his stepfather curses at him and accused him of doing witchcraft.  Officer Brown and CPS Worker Lynch were fully aware of this incident between D.H. and Tara Hart. D.H was upset that the Plaintiffs were inquiring and seeking out help for him. He didn't like that they were looking for places that could give him more one on one supervision, and he would be leaving home once a place was found.  A lot of time was focused on D.H. behavior at home and school when there are other children in the household that was being affect by D.H. He has harmed all three of his siblings and was continually intimidating T.H and N.S.

22. The Plaintiffs received a phone call and an email from Tara Hart on December 26, 2016. D.H. told the school library assistant that he had thoughts of running away from home. He said that Mr. Sanchez thinks he does witchcraft and curses at him. When Tara Hart addressed D.H. he immediately denied it and then admitted to saying it but said he was only joking. Probation Officer Brown saw D.H. that same week and he was aware of the situation.

23. D.H. admitted he wasn't serious about running away. Tara Hart talked with D.H. about the effects saying something like that. D.H. didn't like that the Plaintiffs were looking into different option to get D.H. help for his behavior and that there was a place that would give him one on one help with his behavior, attitude and school work.

24. At about the time, Plaintiffs tried to seek help for D.H. from numerous different sources, including by sending him to counseling at their church, but his behavior did not improve.

25. On September 12, 2016, Plaintiffs filed and put D.H on PINS ("Person in Need of Supervision") in an attempt to help D.H. A PINS petition is an action in state court that asks the Court to find that a child is in need of supervision. If the parents of an individual have proof of behavior problem they could request that the child be evaluated for PINS and placed on it first before going to court which the Plaintiffs did.

26. Glen Brown, a probation officer in Dutchess County, was assigned to D.H.'s case on or about September 22, 2016.

27. Probation Officer Brown met regularly with D.H.

28. Probation Officer Brown recommended that D.H. receive an evaluation regarding D.H.'s serious emotional issues from Astor Services for Children and Families ("Astor"). Plaintiff's scheduled an appointment for that evaluation on May 18, 2017.

29. Three days earlier, D.H. had lied and reported on May 15, 2017 that he slept in the garage, and he had stated to Tara Hart, school social worker, and Eric Lynch, school principle, that it was for one night on 3/13/17. Then during the next interview with CPS Worker Lynch, she states D.H. said he slept in the garage for two nights. These are only few examples when D.H. has told falsehoods and lies to varies parties involved in the situation.

30. Also in the write up from Tara Hart, D.H. told her that he lies to cover things up and to try and match what his step-dad says the "spirit" tells him D.H. did. Tara also stated D.H. apologized to her for making the story up the week before about being in a fight and sleeping weird. D.H. said those were made-up to cover up for why he had bruises and was sore. The nurse checked him the week before when he was complaining and there were no bruises visible. D.H. stated

that day it was from being hit by step-dad. This was further example of D.H.s continuous lying pattern.

31. On Friday, May 12, 2017, D.H. came home from school with a bruise on his right eye and right side of his face. The bruises were under his right eye and on the right side, on his right cheek. When D.H. left for school earlier that morning, he did not have any visible bruises. This was not the first time he had come home from school with bruises, or the first fight he has been in. D.H. has been in other altercations at school physically and verbally with his peers (fighting in gym 2/14/2017). D.H. has come home with bruises on his face, arms and his neck, practically every week. He said he had a fight with other children, mostly three boys in particular.

32. The school have never investigated Plaintiffs for any of these bruises. There is no reason to. When D.H. would come home with bruises Plaintiffs would call and speak to Eric Lynch, Eugene Brooks Intermediate school principle. For some of these incidents, Eric Lynch he would be aware of and for others he wouldn't be aware of.

33. Mrs. Sanchez called to inform the school of the incident that D.H. stated happened between him and certain students in his class. Eric Lynch, the school principle, said he had no record of a fight between D.H. and anyone. Mr. Lynch said he would speak with D.H. on Monday morning about the incident and look into it. The Plaintiffs never received a call back. On Monday morning D.H. went to school blaming Mr. Sanchez for those same bruises.

34. On Monday May 15, 2017, there was a report filed to CPS (Shanell Mays was the responding worker) by Mr. Lynch, the principle from Eugene Brooks Intermediate school, and Tara Hart, the school social worker, that D.H. claimed he had to sleep in the garage, that Mr. Sanchez hit him on the face and arm (same spot and marks that he came home with Friday May 12, 2017 after his fight in school that was reported to Mr. Lynch by Mrs. Sanchez) and that he was

scared to go home. The other children came home that same day and CPS showed up a week later (after canceling our schedule visit) the day after Plaintiffs made a report to officer Doty to have D.H. removed from their home.

35. Shanell Mays showed up to the Plaintiffs house on May 15, 2017 accompanied by a police officer. She asked questions to Mrs. Sanchez and S.H. She checked N.S. for any bruises and check the house to make sure it was adequate for the children. D.H. and T.H. returned from school that day after May evaluated the situation.

36. The Plaintiffs made CPS worker Mays aware that D.H. continued to misbehave, and that they need help with him, she advised if he continues to get out of control for them to call the police. She also stated that she would be contacting Probation Officer Brown.

37. Probation Officer Brown was aware of D.H. increasing aggressive and disrespectful behavior. D.H has attempted to hurt Mr. Sanchez (S.H. was a witness to the incident), as well as D.H. has hurt T.H. and N.S on many occasions. Probation Officer Brown provided Plaintiffs a phone number for Dutchess County Helpdesk. When Plaintiffs called that number on May 13, 2017 they could only give them help for a day and forward them to Four Winds.

38. A few days later, on May 22, 2017, D.H. admitted to Police Officer Benjamin Doty that he had inflicted the bruises on himself with the intention of blaming his stepfather. Dotty was the same officer that was called because of D.H.'s and S.H.'s behavior and the vandalism. The Plaintiffs called the police on two different occasions, May 14, 2017 the day before D.H. made the report and on May 22, 2017. D.H. told the school social worker Tara Hart and School principle Eric Lynch he received the bruises from his stepfather. D.H. told Plaintiffs on Friday May 12, 2017 that he got bruises from a fight (that's when Plaintiffs called the school to verify), he told the school on May 15, 2017 he got the bruises from his stepfather. Plaintiffs recorded

D.H. on May 16, 2017 telling them he got the bruises from hitting himself with the broom (S.H. and the Plaintiffs were present during that conversation). Then D.H. told Doty on May 22, 2017 that he hit himself and blamed his stepfather. For the bruise on D.H.'s face he had four different stories that he told various parties.

39. Over the weekend, D.H. vandalized equipment belonging to Plaintiffs' landlord. Plaintiffs called Millerton Police Department on May 14, 2017 and left message. The officer who returned the call advised them to call D.H.'s probation officer, Glen Brown.

40. Probation Officer Brown told Plaintiffs that he would go see D.H. in school and to bring him in on Thursday May 18, 2017 at 4:30 to discuss. When they brought D.H. in Probation Officer Brown did not attempt to take action nor did he show any concern for D.H. or the Plaintiffs.

41. Plaintiffs took D.H. to the Astor evaluation on or about May 18, 2017. Plaintiff's also brought D.H. to Probation Officer Brown on that day.

42. The Astor evaluation stated that during the interview D.H. speech was soft, his mood anxious, his attitude towards parents is that he ignores them, his thought process coherent, cognition intact, and the insight is that he mostly blames others for problems.

43. On 6/10/2016 Plaintiffs received email stating D.H. slammed a chair into another student's leg for which the student had to go to the nurse and he is very argumentative. On 9/19/16 Plaintiffs received email stating D.H. was disrespecting the teacher assistant. On 10/13/16 Plaintiffs received an email that stated D.H. is antagonistic to peers and telling Eric Wiener he wants to punch someone in the face. On 11/15/16 Evelyn Brennie stated D.H. attitude seems to interfere with his learning. Finally, on 1/3/17 Heather Farr-Killmer stated D.H. is argumentative and disruptive.

44. On the Astor report D.H. reported to the Amanda the mental health counselor that he gets into trouble at school almost every day and that he is aggressive at home. D.H. stated to Amanda he wanted to work on his aggressive behavior.

45. S.H. has also lied on many occasion to both the Plaintiffs and her teachers. On, March 30, 2017 the Plaintiffs received an email from S.H.'s teacher Sarah Martin stating she has not been turning in her school work or homework. When Plaintiffs addressed S.H. she stated she has been handing in her work. Email sent to Plaintiffs from Sara Martin stated that she hasn't received any work from S.H. When asked Mrs. Dieter-Smith whom S.H. stated she handed the work to said she knew nothing about it. Both teachers had a conversation with S.H. about being more responsible and honest with everyone.

46. Other emails between Plaintiffs and S.H.'s teachers are evidence that she tells everyone different stories to keep from doing her school and homework. Kimberly Kerrigan stated in her email that S.H. seems to her to be manipulating the school counselor and herself to buy herself more time to get her project done. S.H. was telling all adults in her school as well as the Plaintiffs a different story to not do her school work.

47. Patrick McKeever was another one of S.H.'s teachers. The Plaintiffs would email back and forth with the teacher about S.H.'s work and what exactly she would be telling each of them. It was clear that she chose to lie to both her parents and McKeever.

**Officer Benjamin Doty's Misconduct**

48. On May 22, 2017, Plaintiffs called the police department again, asking for an officer to come to their home because D.H. was getting loud, aggressive, and breaking things that belonged to Plaintiffs' landlord. Plaintiffs did not call 911, but they called and told the police office that

they needed someone to come to their home because D.H. was getting aggressive, loud and breaking things.

49. An officer, Benjamin Doty, came to the house. The Plaintiffs invited the officer into the house. He didn't search the house, but he did look into the dining and living rooms. He spoke with the two eldest children, S.H. and D.H. The Plaintiffs told Doty that they have an open case with CPS. That's when D.H. admitted to Officer Doty that he falsely blamed his stepfather (D.H. also stated it to the social worker at Astor) for the bruises he had when he came home from school on May 12, 2017 in the hope of harming Mr. and Mrs. Sanchez's relationship. In front of Mrs. Sanchez, S.H. and officer Doty, D.H. stated "I hit myself and I told everyone at school my stepfather did it". Then officer Doty asked him "does he know that it was wrong", D.H. stated "I know it was wrong, but I wanted to do it" and Doty asked him why and D.H. stated "I wanted to break up their marriage because my stepfather won't let me do what I want". Then Doty told both D.H. and S.H. that falsely accusing and lying on their stepfather could get him in a lot of trouble.

50. Police Officer Doty also spoke with Mr. and Mrs. Sanchez, who begged him for help with D.H.

51. Officer Doty advised the Plaintiffs he would contact Dutchess County Department of Community & Family Services-Child Protective Services ("CPS"), but that because the kids seem fine and there were no signs of abuse, nor did the children feel scared or intimidated, he saw no need to do anything that night.

52. Police Officer Doty called CPS and informed them about what was going on May 22, 2017. The on-call CPS worker spoke with Police Officer Doty and he told that worker that the children were just eating dinner and it seemed the situation had calmed down and that no one was being harmed or out of control, and that there was no sign of abuse.

53. Plaintiffs asked Officer Doty to file a police report concerning this event, but even though they made several requests for the report after the incident, they were not given access to the police report until September 2017.

54. On information and belief, the delay in their receipt of the report indicates that Police Officer Doty did not write the report at the time of the incident, when the circumstances were fresh in his mind, but instead wrote it much later. Police report states date of action June 15, 2017 and date written was June 15, 2017, but Plaintiffs were not given access to incident report until September 1, 2017 after Plaintiffs turned themselves in for a warrant Police Officer Doty filed on behalf of CPS Worker Lynch. Every time Plaintiffs or Plaintiffs lawyers enquired about report they were told it was not finished.

55. As a result, the report was misleading and contained inaccuracies.

56. For example, the report neglected to mention that D.H. admitted that he had falsely blamed his stepfather for bruises on his face that he inflicted on himself on May 12, 2017, in the hope of getting his stepfather out the house. It failed to indicate that Police Officer Doty had told the children that falsely accusing someone is a crime and could get Mr. Sanchez in a lot of trouble.

57. In addition, the report stated that the kids seemed very "off" and had not been willing to speak with him. At the same time, the report stated that he asked S.H. and D.H. questions and the children answered. D.H. and S.H. answered all his questions. and spoke to him very openly.

58. The report neglected to mention that the children showed no physical signs of abuse.

59. The report included part of the incident when Police Officer Doty showed up to the Plaintiffs house and accusations he received from CPS worker Lynch. Officer Doty stated that Plaintiffs had forced D.H. to sleep in the garage as punishment for two nights, even though D.H. had told officials at his school Eric Lynch and Tara Hart that he had been forced to sleep in the

garage as punishment for one night. D.H. never had to sleep in the garage but he did go into the garage on May 14, 2017 and started breaking the Plaintiffs' landlord belongings, which they called Millerton Police and tried to make a report about that, as well.

60. Officer Doty mishandled the preparation of the report on his visit to the Sanchez home in a manner that, on information and belief, reflects a failure on the part of County of Dutchess to train and supervise police officers properly.

### Probation Officer Glen Brown's Misconduct

61. A CPS worker, Candace Lynch, was sent to the Sanchez home on May 23. The Plaintiffs were told that the on-call worker would show up just for the weekly visits, when in fact CPS was supposed to show up on Monday but canceled, and then showed up two days later after Plaintiffs made the report with Police Officer Doty.

62. There have been other CPS workers that showed up to Plaintiffs' home. For example, Shanell Mays, who was the respondent from the claim on May 15, 2017, came and checked the children and the only one that had a bruise was D.H. and it was the bruise that he came home with on Friday May 12, 2017. Another worker that came to Plaintiffs' home around June 2016 for accusations that the children stood on the wall for excessive amount of time as punishment was unfounded. She was the one to refer Plaintiffs to the PINS program and told Plaintiffs to look into places like River Haven Emergency shelter and crisis service. The Plaintiffs did contact River Haven, but they only could help for a period of one month and they had a long waiting list.

63. Before, during and after the visit, all the children were well fed, did not have any visible bruises or other injuries, the children were clothed, the children were nourished. The children appeared in good physical health. The CPS worker did not observe or learn of any parental misconduct.

The CPS worker did not observe or learn of any inappropriate corporal punishment from either parent.

64. Following that visit, on May 24, Probation Officer Brown sent CPS worker Lynch an email providing information about the family.  That email was misleading.

65. In particular, the May 24, 2017 email written by Probation Officer Brown failed to mention any of D.H.'s numerous behavioral issues or Plaintiffs' attempts to secure help for D.H. Instead, Probation Officer Brown focused only on negative comments Plaintiffs made about D.H. during meetings, stating that Plaintiffs never had anything nice to say about D.H. However, Plaintiffs were merely sharing their concerns about D.H. with Probation Officer Brown to give him an idea of the problems D.H. was having at school.

66. The email falsely stated that Plaintiffs said negative things about D.H. in front of him, when in fact the only negative things they said about D.H. in front of him were reports about incidents at school or home, to keep Officer Brown aware of D.H.'s situation. Things Plaintiffs said included: D.H. has problems listening and respecting authority, he is being disrespectful at home and at school, he gets into altercations with fellow classmates, he knows what he is doing is wrong, but he makes no effort in trying to change or stop his behavior.  When Probation Officer Brown asked D.H. about his actions D.H. responded to him that he knew what he does is wrong, that he wants to do it, and that he wasn't sorry and that he knew he would get in trouble but then he gets mad when he does get in trouble and don't get away with what he did. Probation Officer Brown got frustrated with him. Plaintiffs did not put D.H. down in front of Officer Brown.

67. The email failed to mention that Plaintiffs engaged in sound parenting methods with D.H., including using positive reinforcement by rewarding good behaviors, such as taking him

somewhere special or giving him back certain items they had confiscated, when D.H. acted properly. When the weather started warming up they would take the children hiking and on walks as a family. They would go to church on Sundays together. The Plaintiffs would take the children to the mall, to Dave & Buster's, and other places that are rewarding to the children. D.H. would also be able to watch movies, play card games as a family, and play games with his other siblings.

68. The email misleadingly failed to mention that D.H. had told Probation Officer Brown that his bad behavior was intentional, that he knew it was wrong and that he had no remorse because he enjoys the rush of getting into trouble.

69. The email failed to mention that D.H. told Probation Officer Brown that the Plaintiffs did take him places and did do things with him as a family.

70. The email failed to mention that Officer Brown himself would at times gets frustrated with D.H.'s behavior.

71. The email stated that Plaintiffs said that D.H. was getting into fights at school, but falsely stated that Officer Brown had no record of fights when the Plaintiffs have letters from the school acknowledging the fights. All information was given to Probation Officer Brown on his weekly meeting with D.H. at school. Probation Officer Brown also met and talked with D.H.'s teachers and principle once a week for updates on his behavior, attitude and grades. During the meeting between the Plaintiffs, Probation Officer Brown and D.H., Probation Officer Brown would review the information he received from the school with Plaintiffs and D.H.

72. The email falsely stated that D.H. looked to Plaintiffs for approval when being questioned by Officer Brown, and repeated answers given by Plaintiffs, when in fact that is not the case.

73. The email falsely stated that Plaintiffs did not follow his recommendation to get counseling for D.H. at Astor when in fact they took D.H. to Astor to be evaluated and sent the findings to Brown on or about May 18, 2017.

74. The email falsely stated that Plaintiffs failed to follow through on their statement that they would take D.H. to youth services for counseling, without mentioning that they made three separate appointments, one of which was rescheduled by the counselor and two of which Plaintiffs rescheduled due to family emergencies.

75. When Plaintiffs told Probation Officer Brown that they took D.H. to religious counseling with their church, he stated that "religious counseling isn't good enough" implying that since the counseling was part of their church and religion, it will be useless regardless of the fact that it would have been provided by counselors with official counseling credentials.

76. Probation Officer Brown made no attempt to discuss with Plaintiffs any of the concerns he raised in his letter to CPS Worker Lynch before he raised them with her.

77. Notably, Probation Officer Brown never reported any incident involving D.H. before he sent his email to CPS Worker Lynch. Had he truly believed that D.H.'s situation was as alarming as Probation Officer Brown portrayed in his email, he should have reported the incident.

78. Probation Officer Brown grossly mishandled his work with D.H., in a manner that, on information and belief, reflects a failure on the part of County of Dutchess to train and supervise probation officers properly.

**CPS Worker Candace Lynch's Misconduct**

79. CPS Worker Candace Lynch, who works with Country of Dutchess Department of Community and Family Services-Child Protective Services, was assigned to visit Plaintiffs' home, which she did for the first time on or around May 23, 2017.

80. Plaintiffs fully cooperated in allowing her to speak with the children and to check them for any physical marks. She found none.

81. Before, during and after the visit, all the children were well fed, did not have any visible bruises or other injuries, the children were clothed, the children were nourished. The children appeared in good physical health. CPS Worker Lynch did not observe or learn of any parental misconduct. The CPS Worker Lynch did not observe or learn of any inappropriate corporal punishment from either parent.

82. CPS Worker Lynch improperly pressured the Sanchezes' oldest child, S.H., to speak to her privately, despite S.H.'s refusal. She kept insisting, trying to push and intimidate S.H even though S.H. kept telling her she didn't want to, yet CPS Worker Lynch still kept insisting until the Plaintiffs had to step in and tell CPS Work Lynch that S.H. didn't want to go upstairs. They also advised her of how other workers talked to the children all together to eliminate any uncomfortable feelings.

83. In her report in connection with the removal petition, CPS Worker Lynch falsely stated that Plaintiffs refused to allow her to meet privately with S.H.

84. CPS Worker Lynch asked S.H. to explain the reason she chose to sleep downstairs and S.H. answered that she got scared at times when sleeping upstairs. S.H explained she got scared because she had bad dreams and heard noises.

85. However, in CPS Worker Lynch's filing with the family court in connection with the removal petition, CPS Worker Lynch falsely stated that S.H. said Plaintiffs made the children sleep on the floor for punishment.

86. In her report in connection with the removal petition, CPS Worker Lynch neglected to mention that T.H. told her that he was scared of his older brother D.H.

87. Her report failed to mention D.H.'s behavior problems or that he had admitted to lying on more than one past occasions about supposed mistreatment by his stepfather.

88. The report neglected to mention that there were no signs of physical abuse on any of the children.

89. Her report stated that CPS had provided Plaintiffs with counseling and advice against physical discipline to avoid the need for this petition and removal of the children, but those efforts had been unsuccessful. In fact, no such counseling or advice was ever provided, and children were taken in a matter of one day from the time CPS Worker Lynch showing up on May 23, 2017 to the time CPS worker removing children from the Plaintiff's home on May 24, 2017.

90. No one has ever told Plaintiffs not to use physical discipline, which in their case they never did. None of the children ever showed any sign of abuse, they all went to regular checkups, were up to date on all vaccines, were well-nourished and happy.

91. CPS Worker Lynch's efforts to arrange for the removal of the children from their home were apparently based at least in part on her distaste for Plaintiffs' religious beliefs.

92. When CPS Worker Lynch asked Plaintiffs about their disciplinary practices, and they told her that they got advice from religious advisors to make sure that the children understood right from wrong, she said that Plaintiffs were punishing the children too harshly because of Plaintiffs' religious beliefs. She stated that Plaintiffs must not push their beliefs onto the children in that way. CPS Worker Lynch implied that she was troubled that many of Plaintiffs' parenting choices were informed by religious principles.

93. On May 24, 2017, the children were retained at school and Plaintiffs received a call that the children were being removed from the home and that the Plaintiffs had to report to family

court for further information. The Plaintiffs were not informed about any of the steps the defendants took. They didn't receive any information ahead of time. The school actually called and said S.H. was going to stay after school for extra help (which they lied about). This was done without a court order. The court order was received after reporting to court that evening, just a phone call stating Plaintiffs' children were being taken away from them and they will get more information at court. CPS worker Lynch called Plaintiffs but would not give out any information.

94. According to CPS, the finding against the Plaintiff Mr. Sanchez were that he committed acts of excessive corporal punishment against D.H., S.H. and T.H. including hitting them with a belt and flashlight, making them stand against the wall, choking them, and placing the children at risk of harm. As a result, N.S. (the youngest and fourth child) is also a derivatively neglected child. Mr. Sanchez allegedly committed acts of domestic violence against his wife Mrs. Sanchez in the presence of the children placing them at risk. The findings against Mrs. Sanchez were that she committed excessive corporal punishment against her children D.H, S.H., T.H and failed to protect her children from Mr. Sanchez's acts of corporal punishment placing the children at risk of harm. As a result, N.S. is a derivatively neglected child. The children D.H, S.H, T.H were never hit with a flashlight or a belt, none of them ever got choked by the Plaintiff Mr. Sanchez. They never showed any signs of physical abuse including bruising, distress and not wanting to go home. As Mrs. Sanchez stated on many occasions to many individuals including CPS Worker Lynch, CPS Worker Mays, other CPS workers, and Plaintiffs lawyers that Mr. Sanchez has never abused her or the children. Mr. Sanchez never put his hands on her. None of the children were ever at risk of harm. S.H. and T.H. are constantly playing with their younger brother N.S. (there

are pictures to verify this). There is also a recording in which D.H. admitted to hitting himself and blaming Mr. Sanchez, admitting to practicing witchcraft, cutting himself and placing blood on the school grounds. D.H. also stated that he was doing such things before the family moved to Millerton. In this recording, one could hear the children in the background playing happily.

95. After the family court hearing on May 24, 2017 which CPS Worker Lynch initiated the proceeding on (and which Plaintiffs heard about the same day about an hour before they had to report to court) all four children were placed into a foster home by the family court based on testimony and filings by CPS Worker Lynch, Probation Officer Brown and officials from the Webutuck School District. CPS Worker Lynch lied in the court petition stating that the Plaintiffs did not allow her to speak to the children alone. When in fact it was the children that didn't want to talk alone. That's when the Plaintiffs advised her of how the previous CPS workers approached the conversation with the children, interviewing them together the first time to eliminate them feeling scared or overwhelmed. When CPS Worker Lynch entered the Plaintiffs home she was very rude and acting very unprofessionally. She stated that S.H expression was stoic when in fact S.H stated in front of CPS worker Lynch and everyone in the house that she didn't want to go upstairs to her room alone with CPS Worker Lynch, showing that she is able to make her own choice where she wanted to talk and that she wasn't scared, and she was at ease and responsive to the conversation. CPS Worker Lynch wrote that S.H. stated that they stand against the wall 'until we are good", then she claimed she asked her again and S.H. then stated that "we do it every day" and we get off the wall when we behave (Plaintiffs have pictures that show S.H. and T.H. playing with N.H. constantly which is contrary to those statements). Lynch stated that S.H. told her the last time she got hit

was yesterday (May 22, 2017) which was a lie. CPS worker Lynch checked S.H for bruises and there was none anywhere on her body. S.H was never hit for vandalizing the car, but Millerton police was called instead, and Officer Doty did respond to the incident. CPS Worker Lynch then met with D.H. and she stated that when she questioned him, D.H kept looking over to where his step father Mr. Sanchez was sitting and replied that he didn't feel safe, and that his step father made him feel unsafe. CPS worker did not take the children that night, nor did she state to the Plaintiffs her concerns, if any, or what she expects them to do or not do. She did not provide them with any services as stated in the court petitions either.

96. In the same petition, CPS Worker Lynch stated she feels that children safety was at risk when in fact after these absurd accusations from May 15, 2017 the children were not taken until May 24, 2017. CPS Worker Lynch stated that T.H. appeared very stoic throughout the interview. T.H is seven years old who before the visit was playing with his two-year-old brother N.S. Like any seven-year-old would, T.H. much rather be playing than being drilled with questions. T.H. stated he was scared that night but he told CPS Worker Lynch, it was his brother D.H. he was scared of, which Lynch failed to record, lied and said he was scared instead of his step father Mr. Sanchez. CPS Worker Lynch stated in the petition that Mr. Sanchez became agitated and stated that the other CPS workers did not act this way and that he had a bad vibe about her. Mr. Sanchez did not become agitated with CPS Worker Lynch, who on many occasion during that visit raised her voice and got tough with the Plaintiffs for inquiring about the situation.

97. The family court's decision to remove all four children from the Sanchezes' home was based on CPS Worker Lynch's faulty report and testimony.

98. After the removal, CPS Worker Lynch tried on numerous occasions to convince Mrs.
Sanchez to leave Mr. Sanchez and state that he abused the children. CPS Worker Lynch told
Mrs. Sanchez that the children would be returned to her if she left Mr. Sanchez and if she
confirmed that he had abused the children.

99. CPS Worker Lynch also tried several times to get Mrs. Sanchez to accuse Mr. Sanchez of
abusing her, even though Mrs. Sanchez has repeatedly stated that Mr. Sanchez does not
abuse her.

100.    On October 11, 2017, County of Dutchess CPS improperly asked the family court to
preclude all visitation between the Plaintiffs and their children. County of Dutchess CPS
made this request even though New York law provides that there should always be some
form of visitation unless there is a demonstrable risk of harm to the health and safety of the
children as a result of the visitation, and even though there was no such risk, particularly if
restrictions were placed on visitation. The family court granted that request, although it
restored supervised visitation for the youngest and therapeutic visitation for the older three
starting on December 21, 2017. The Plaintiffs were denied complete access to their children,
and were not able to see or speak with them for over 4 months from August 28, 2017 to
December 18, 2017.

101.    After the order of protection was filed against Plaintiffs' the younger two children N.S.
and T.H. started having trouble due to the abrupt cease of communication between them and
their parents. When T.H. asked Taylor Dziuba and Candace Lync, they told T.H. that no his
mother has not come to see him and no she hasn't called. When in fact it wasn't the
Plaintiffs choice to stop seeing their children but the choice of both Judge Egitto and Judge
McCabe. Which is now the cause of T.H. having resentment, abandonment issues and is

now upset with Mrs. Sanchez and doesn't want to see her. This was irresponsible, careless, insensitive and thoughtless on behalf of those who are supposed to have the children's best interest in mind.

102.    CPS Worker Lynch grossly mishandled the Sanchez children's removal case by conveying misleading information to the family court. On information and belief, her mishandling of this removal case reflects a failure on the part of County of Dutchess to train and supervise CPS workers properly.

## Judge Egitto Misconduct – Family Proceedings Judge

103.    On Wednesday May 24, 2017 Plaintiffs appeared in front of Judge Egitto with accusations against them of child abuse towards the older three children S.H, D.H. and T.H. which are Mrs. Sanchez biological children and Mr. Sanchez step children, not including the younger one N.S., which is their child together.

104.    Judge Egitto only heard the CPS Worker Lynch's and CPS Attorney Laura Skojec's accusations, that were relayed to them by a third party, before Judge Egitto granted the temporary removal of all four children. The Plaintiffs were not allowed to speak or defend themselves before the drastic and improper decision to take all of their children was made.

105.    In each of the subsequent court appearances, Plaintiffs were always required to hear what the other party CPS Attorney Skojec wanted to state and what she insisted should happen at each court appearance, never allowing Plaintiffs' lawyers to speak on their behalf or giving Plaintiffs the option to speak themselves.

106.    When Mrs. Sanchez did try to explain the situation when asked about the biological father of S.H., D.H. and T.H., Judge Egitto became very offensive and didn't allow Mrs. Sanchez to explain even though Judge Egitto asked the question in the first place. Months later, the same

facts that Mrs. Sanchez tried to provide regarding the biological father of S.H., D.H. and T.H. were proven to be true.

107.    Judge Egitto put an order of protection against Mr. Sanchez towards his three step children. T.H. was requesting to see Mr. Sanchez ever since they were taken away. Mr. Sanchez has been the only father that the three children have ever had in their whole life.

108.    Judge Egitto was allowing a speedy request for transfer of custody to Davion Sr., the biological father, without proper evaluations and research on Davion Sr.  Mrs. Sanchez's lawyer had to state to Judge Egitto and CPS Attorney Skojec that it seemed that they were not following the right procedures and trying to illegally speed up the process.

109.    It has been over seven months into the case and the Plaintiffs still have not been given a chance to talk in the court room and explain their side of the facts.

110.    Judge Egitto has allowed the opposing parties CPS Attorney Skojec and CPS Worker Lynch to lie and state things to make the Plaintiffs Mr. and Mrs. Sanchez look bad. They improperly pulled things from both of their pasts to try to portray them as being bad parents.

111.    CPS Worker Lynch, CPS Attorney Skojec and Judge Egitto worked with Police Officer Doty and Judge McCabe to file charges and place a new order of protection against Mr. Sanchez to not see or speak to all four of Plaintiffs' children, and an order of protection against Mrs. Sanchez to not see or speak to all four children on Aug. 28, 2017.

112.    On 9/13/17, Judge Egitto made a statement that prejudged the Plaintiffs and their case, and showed partiality and bias to the defendants. He stated that even though the children have endured things at home that doesn't mean they don't want to see their parents. He implied that he believed that the children had endured things at their home without any proof of that.

113.    Judge Egitto has improperly used his power as a judge and did not follow the New York
        State law in disallowing visitations and communications between Plaintiffs and their
        children. He has used his decisions on visitations as a leverage to make Plaintiffs do
        recommendations as put forth by CPS as if Plaintiffs were found guilty after trail, which they
        have not been.

114.    In the 10/11/17 court appearance, Judge Egitto stated that if Plaintiffs did not take
        psychological examinations that they would not be allowed to see their children, which is
        supposed to be a requirement only if Plaintiffs were found guilty after trail.

115.    Making such demand with no proof that accusations are accurate and true, shows a
        prejudice and partiality in Judge Egitto judgements.

116.    Judge Egitto have not looked at all evidence presented.

117.    Judge Egitto is failing to look at behavior problems D.H. and S.H. continuously display
        that shows proof of the behavior they had at home.

118.    Subsequent to the start of the Family Court proceedings and after all the children were
        taken away from the Plaintiffs, D.H. has been put back on PINS because of his behavior at
        The Children's Home (where he has received a felony for destruction of property and
        aggressive behavior). D.H. was also kicked out of school.

119.    S.H. has also been put on PINS for running away and not abiding by the rules set forth by
        the Children's Home.

120.    Judge Egitto improperly granted the transfer of the Plaintiffs four children to another
        foster home hours away from where they were initially placed. Not notifying the Plaintiffs
        until 5:30 p.m. on Friday, the day of transfer, via email after everyone has left for the
        weekend. The Plaintiffs were not able to get in touch with anyone until Monday morning.

121.    Judge Egitto improperly allowed CPS and Abbott house, the place where all the children

are currently residing, to register D.H. in public school even though prior arrangements were

made for him to be placed in a mental hospital for care and schooling until deemed fit, after

getting kicked out of school (per recommendations of Webutuck School District and Astor).

122.    On December 18, 2017 Judge Egitto stated that the Plaintiff Mr. Sanchez was not allowed

to step foot into the city where the Plaintiff Mrs. Sanchez will be visiting the older three

children. T.H., S.H. and D.H. This is an excessive use of power, since the order of protection

that Mr. Sanchez has states he has to stay 500 hundred feet away from the three children or

the house where they reside, and the school they go to, but it does not say anything about Mr.

Sanchez being in the same city as the children.

123.    Also on December 18, 2017 the Plaintiffs were allowed partial visitations - supervised

visitations between the Plaintiffs and their youngest son N.S., and therapeutic visitations

between Mrs. Sanchez and the older three children T.H., S.H. and D.H.

124.    As of December 27, 2017, visitation has still not been arranged for Mrs. Sanchez with the

three older children T.H., S.H. and D.H. Judge Egitto granted permission for the maternal

grandmother to speak with the children before communication and visitation was granted to

the parents, and allowed a visitation between maternal grandmother and children. Plaintiffs

have not been allowed to speak with their own children, which shows favoritism towards the

other parties and shows discrimination against the Plaintiffs. The purpose and priority are to

keep the relation between the parents and the children, so that the children will  come back

home even though they shouldn't have been taken in the first place.

125.    Also Judge Egitto is not enforcing the rights of the parents in reference to their children.

Judge Egitto was made aware by Plaintiffs' attorneys in the court appearance on December

18, 2017 that the Plaintiffs are not being properly informed about their children. And when

Plaintiffs contact CPS or Abbott House, where the children reside, they are not getting any

response.  Also, a meeting that the Plaintiffs were supposed to be present on and informed

about was held without proper notification, nor were the Plaintiffs given any information

about it until after the meeting had taken place, clearly and openly showing through their

actions that they are keeping the Plaintiffs in the dark about their own children. When asked

by Judge Egitto the parties lied and stated they sent a letter to Plaintiffs' home address and

tried calling three times, when Judge Egitto knows Plaintiffs have given their P.O. Box

address to officials several times in court. Judge Egitto still asked Plaintiffs if they had given

out the proper information showing partiality towards the other party. When Judge Egitto

asked the Plaintiffs about the phone call, Plaintiffs stated that they picked up the call but

couldn't hear anyone speak due to bad reception then called back and no one from CPS knew

who called.  The Plaintiffs then left messages for CPS and no one returned the phone call

back. Then Judge Egitto said to Plaintiffs have to make sure they have reception, which show

once again partiality towards the other party. This showed that Judge Egitto is leaning against

Plaintiffs and in favor of the other party.

126.    Judge Egitto is not allowing the paternal grandparents, Mr. Sanchez parents, to visit the

three older children T.H., S.H., D.H. or even their grandson N.S. or speak to them. The

paternal grandparents had a relationship with the children even when the maternal

grandparents didn't care to, this in turn shows Judge Egitto is discriminating towards Mr.

Sanchez due to his restrictions. T.H. has always asked to see Mr. Sanchez parents but the

court still refuses to allow any visitations with them, as well as refuse for them to see their

two year old grandson.

127.    Thomas Gabino ("Gabino") the attorney for the children kept lying about not speaking to the children T.H, S.H, D.H., when in fact Gabino has spoken to them. Plaintiffs' attorney made Judge Egitto in court aware of this and Judge Egitto has never followed up nor openly in court spoken to Gabino about it.

128.    The Plaintiffs' parents were aware of the older two children D.H. and S.H. misbehavior at home and at school. Mrs. Sanchez's parents (Mr. and Mrs. Dabbs) recommended that D.H. be sent away to a group home. Mrs. Dabbs provided the contact information for a place in Texas. Mrs. Dabbs is allowed to see and speak with all four children.

129.    Judge Egitto being aware of this and other situation where Mrs. Dabbs spoke to the children about the case after being informed on many occasion to not speak with them about the situation. Even after Mrs. Dabbs failed to comply, she is still allowed to continue visitations and phone contact, when neither the Plaintiffs or Mr. Sanchez's parents are allowed to. This shows unfairness, favoritism, partiality and discrimination on behalf of Judge Egitto.

## Judge Casey McCabe Misconduct – Criminal Proceedings Judge

130.    Judge McCabe improperly accepted the criminal case against the Plaintiffs three months after family court case was filed by CPS Worker Lynch. Judge McCabe improperly allowed accusations filed by CPS worker Lynch and Office Benjamin Dotty to be presented in front of her.

131.    Judge McCabe allowed a criminal case to be filed against the Plaintiffs without the proper paperwork being filed with the court and presented by CPS Worker Lynch.

132.    Knowing it was a family court matter based on the underlying accusations she chose to still allow the case to proceed.

133.    Judge McCabe has also improperly allowed the case to proceed when she knows that the criminal complaint file is legally insufficient.

134.    Judge McCabe chose to use her judicial power and title as a judge instead of fairly and without bias using the law to handle the Plaintiffs case.

135.    Judge McCabe improperly placed a full "stay-away" order of protection against Mrs. Sanchez on Aug. 28, 2017 not allowing her to see or talk to her children, as well as mandating her to attend parenting class and report to probation once a week.  Mrs. Sanchez has no criminal record and such a harsh treatment was completely unwarranted.

136.    Judge McCabe is still not rescinding the probation for Mrs. Sanchez even with the restorations of partial visitation (supervised visitations with the Sanchez youngest and therapeutic visitations with the older three children), with her reporting consistently to probation, and with her appearing to all court dates. Judge McCabe completely disregards that the purpose of ROR/probation is to show that one is in cooperation with the terms of the court in anticipation of coming off of probation.

137.    Judge McCabe improperly set bail for Mr. Sanchez using as an excuse an eleven-year-old unrelated charge, and put a full stay-away order of protection against him on Aug. 28, 2017 not allowing him to see or talk to his son and his three step children.

138.    Judge McCabe did not allow the Plaintiffs to discuss with her these old and unrelated accusations, and the order of protection she issued.

139.    Judge McCabe used excessive power in her actions against the Plaintiffs.

140.    On September 26, 2017 by request of the Plaintiffs' lawyers to modify the order of protection due to excessive power used, Judge McCabe agreed to fill out new order of

protection. She signed it and handed it to Plaintiffs and Plaintiffs' lawyer. She stated it

wasn't her intentions to use excessive power in her decisions.

141.   Between September 26, 2017 and September 29, 2017 Judge McCabe, Judge Egitto, CPS

Worker Lynch, the assigned District Attorney and CPS Attorney Skojec had a conversation,

and Judge McCabe then decided to rescind the agreed upon order of protection and put it

back to a full stay away but allowing family court to modify it.

142.   During the November 28, 2017 court appearance, the Plaintiffs' lawyers stated that there

is not relevant paperwork and the criminal complaint file is legally insufficient to back up the

case that was filed in Judge McCabe's court. The District Attorney has not filed the proper

paperwork since the Plaintiffs first appearance in court on Sept 26, 2017. Also, any

allegations made are not from firsthand/direct observation but from hearsay.

143.   D.H. clearly has shown that he is a discreditable witness due to his behavior and unstable

mental status. Knowing this, Judge McCabe still chooses to allow the District Attorney more

time to get things together and requesting Plaintiffs' lawyers to state the reason why this is

improper in writing.

144.   To this day the District Attorney still has not filed proper paperwork and legally

sufficient criminal complaint against the Plaintiffs.

145.   Mrs. Sanchez's lawyer requested she be relieved of ROR. Judge McCabe insisted that

Mrs. Sanchez be left on probation even though Judge McCabe did not have a valid reason to

keep her on it.

146.   Mr. Sanchez lawyer requested that his case be transferred, and that Mr. Sanchez be

allowed to go before a grand jury to state his case because Judge McCabe has failed to

establish a fair ground to prosecute Mr. Sanchez. She continues to allow the District

Attorney to press a felony charge against Mr. Sanchez based on improper paperwork and

hearsay.

## CLAIMS FOR RELIEF

147.    The below claims for relief are not all encompassing and may be supplemented with

other claims based on any additional inappropriate and unlawful actions taken by each of the

listed defendants and other involved parties.

## COUNT I

### (Police Officer Doty Violated Plaintiffs' Rights Under the Fourteenth Amendment of the U.S. Constitution)

148.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

149.    This claim is brought under *42 U.S.C. § 1983 (1988)*, which gives Plaintiffs a cause of

action against Police Officer Doty who, under color of state law, deprived them of their

"rights, privileges, or immunities secured by the Constitution and laws."

150.    The Due Process Clause of the Fourteenth Amendment requires that severance in the

parent-child relationship caused by the state occur only with rigorous protections for

individual liberty interests at stake. The parent-child relationship is a liberty interest

protected by the Due Process Clause of the 14th Amendment.

151.    Plaintiffs' interest in the custody of their children is a liberty interest which has received

considerable constitutional protection. As parents who have been deprived of custody of their

children, Plaintiffs have suffered grievous loss and such loss deserves extensive due process

protection that was denied to them as a result of Police Officer Doty improper and unlawful

actions in mishandling the preparation of the police report on his visit to the Sanchez home.

## COUNT II

### (Probation Officer Brown Violated Plaintiffs' Rights Under the Fourteenth Amendment of the U.S. Constitution)

152.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

153.    This claim is brought under *42 U.S.C. § 1983 (1988)*, which gives Plaintiffs a cause of

action against Probation Officer Brown who, under color of state law, deprived them of their

"rights, privileges, or immunities secured by the Constitution and laws."

154.    The Due Process Clause of the Fourteenth Amendment requires that severance in the

parent-child relationship caused by the state occur only with rigorous protections for

individual liberty interests at stake. The parent-child relationship is a liberty interest

protected by the Due Process Clause of the 14th Amendment.

155.    Plaintiffs' interest in the custody of their children is a liberty interest which has received

considerable constitutional protection. As parents who have been deprived of custody of their

children, Plaintiffs have suffered grievous loss and such loss deserves extensive due process

protection that was denied to them as a result of Probation Officer Brown improper and

unlawful actions in grossly mishandling his work with Plaintiffs' D.H. child.

## COUNT III

### (CPS Worker Lynch Violated Plaintiffs' Rights Under the First and Fourteenth Amendments of the U.S. Constitution)

156.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

157.    This claim is brought under *42 U.S.C. § 1983 (1988)*, which gives Plaintiffs a cause of

action against CPS Worker Lynch who, under color of state law, deprived them of their

"rights, privileges, or immunities secured by the Constitution and laws."

158.    The Due Process Clause of the Fourteenth Amendment requires that severance in the

parent-child relationship caused by the state occur only with rigorous protections for

individual liberty interests at stake. The parent-child relationship is a liberty interest

protected by the Due Process Clause of the 14th Amendment.

159.    Plaintiffs' interest in the custody of their children is a liberty interest which has received

considerable constitutional protection. As parents who have been deprived of custody of their

children, Plaintiffs have suffered grievous loss and such loss deserves extensive due process

protection that was denied to them as a result of CPS Worker Lynch improper and unlawful

actions in grossly mishandling the Sanchez children's removal case by conveying misleading

and false information to the family court.

160.    CPS Worker Lynch also violated Plaintiffs' religious freedom by arranging the removal

of Plaintiffs' children from their home based at least in part on her distaste for Plaintiffs'

religious beliefs.

## COUNT IV

### (Judge Egitto Has Mishandled Plaintiffs' Family Court Case and by Using Excessive Judicial Power and Overreaching, He Has Violated Plaintiffs' Constitutional Rights)

161.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

162.    This claim is brought under *42 U.S.C. § 1983 (1988)*, which gives Plaintiffs a cause of

action against Judge Egitto who, under color of state law, deprived them of their "rights,

privileges, or immunities secured by the Constitution and laws."

163.    By using excessive judicial power and by issuing improper judicial rulings not supported

by the facts and relying on the misleading and false statements of the other defendants, Judge

Egitto has gravely violated Plaintiffs' constitutional and parental rights. Judge Egitto has improperly and unlawfully allowed Plaintiffs to be deprived of their children.

## COUNT V

### (Judge McCabe Has Mishandled Plaintiffs Criminal Court Case and Has Violated Plaintiffs' Constitutional Rights by Allowing the Case to Proceed Against Them Without the Proper Paperwork Being Filed by The District Attorney)

164.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

165.    This claim is brought under *42 U.S.C. § 1983 (1988)*, which gives Plaintiffs a cause of action against Judge McCabe who, under color of state law, deprived them of their "rights, privileges, or immunities secured by the Constitution and laws."

166.    By issuing improper judicial rulings and allowing a criminal case to proceed against the Plaintiffs when the District Attorney has not filed the necessary paperwork and legally sufficient criminal complaint for bringing criminal charges against them, Judge McCabe has gravely violated Plaintiffs' constitutional rights. Judge McCabe has improperly and unlawfully allowed Plaintiffs to be criminally prosecuted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for a judgment against Defendants for:

A. Declaring the acts and practices complained of herein to be violations of the U.S Constitution First and Fourteenth Amendments;

B. Enjoining and permanently restraining these violations of law;

C. Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful condemnation practices are eliminated;

D.  Returning Plaintiffs custody of their children;

E.  Directing Defendants make Plaintiff whole for all damages, including pain and suffering,

    sustained and hardship endured by Plaintiffs for the deprivation of custody of their

    children;

F.  Directing Defendants to compensate Plaintiff whole for all damages resulting from the

    violation of their federal rights;

G.  Directing Defendants to pay punitive damages;

H.  Directing Defendants to pull Plaintiffs' name from the state central registry (SCR),

    picture and name off the internet and any other private or public sites;

I.  Directing the Defendants to cover the legal costs of Plaintiffs bringing this action; and,

J.  Granting such other relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs respectfully

demand a trial by jury on all matters so triable.

Dated: January __2__, 2018

Matthew Sanchez, Pro Se

Tianna Sanchez, Pro Se