UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
FRANKFURT-TRUST INVESTMENT     :
LUXEMBURG AG,                  :
individually and on behalf of all  :
others similarly situated,     :
                               :
                               :   17 Civ. 3570 (VM)
              Plaintiff,       :
                               :
   - against -                 :   **DECISION AND ORDER**
                               :
UNITED TECHNOLOGIES CORP. et al,  :
                               :
              Defendants.      :
-----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/18

**VICTOR MARRERO, United States District Judge.**

Lead Plaintiff Kapitalforeningen Laegernes Invest
("Kapitalforeningen") brings this putative class action on
behalf of itself and other stock purchasers and acquirers of
defendant United Technologies Corp.'s ("UTC") stock.
Kapitalforeningen alleges that UTC and its senior executives
made materially false and misleading statements and omissions
in violation of Section 10(b) of the Securities Exchange Act
of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et seq., about
UTC's business and projected earnings per share for the 2015
fiscal year. UTC and the individually-named senior executive
defendants, Gregory Hayes ("Hayes"), Akhil Johri ("Johri"),
Alain Bellemare ("Bellemare"), David Gitlin ("Gitlin") and
Geraud Darnis ("Darnis," collectively with the senior
executives, the "Executive Defendants" and together with UTC,
the "Defendants") have moved pursuant to Federal Rule of Civil

1

Procedure 12(b)(6) ("Rule 12(b)(6)") to dismiss the suit for failing to state a claim. ("Motion to Dismiss," Dkt. No. 41.) Defendants argue that the alleged misstatements are either forward-looking statements protected under the Private Securities Litigation Reform Act ("PSLRA") safe harbor or non-actionable opinion statements. Defendants also argue that Kapitalforeningen does not adequately plead scienter.

After Defendants filed the Motion to Dismiss, but before the Motion to Dismiss was ruled on, Kapitalforeningen filed the now-operative second amended complaint. ("Second Amended Complaint," Dkt. No. 45.) The Court now addresses Defendants' letter motion seeking to renew the Motion to Dismiss, but now as to the Second Amended Complaint. (See "Def. Feb. 6 Letter.") For the reasons discussed below, Defendants' Motion to Dismiss is GRANTED.

## I. BACKGROUND

### A. JUDICIAL NOTICE OF DOCUMENTS

This case involves statements made by Defendants in calls with investors and in filings with the Securities and Exchange Commission ("SEC") regarding UTC's profitability between December 11, 2014 and July 20, 2015 (the "Class Period"). Only parts of those statements are quoted in the Second Amended Complaint. Therefore, as an initial matter, the background of this case depends partly on whether and how

2

the Court relies on documents other than the Second Amended Complaint. Of course, at this stage in the proceedings, the Court takes all well-pleaded facts in the Second Amended Complaint as true. See, e.g., Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008). However, in securities cases involving misrepresentation or misstatement claims, courts in the Second Circuit often take judicial notice of documents filed with the SEC "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015) (quoting Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)). For the same purpose, courts in this district also take judicial notice of transcripts of companies' earnings calls. See, e.g., Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compania De Aviacion, S.A.B. de C.V., No. 15 Civ. 1337, 2016 WL 3685089, at *1 n.2 (S.D.N.Y. July 6, 2016).

Defendants have provided numerous SEC filings and earnings call transcripts for the Court's consideration. Many of those filings are quoted or referred to by Kapitalforeningen in the Second Amended Complaint. It is therefore appropriate for the Court to take judicial notice of such documents and to consider them in adjudicating the Motion to Dismiss, examining the documents only to determine

3

what statements they contain rather than to prove the truth of the documents' contents. Kapitalforeningen has been "put on notice by [] [D]efendants' proffer of the documents that the district court might consider them," Kramer v. Time Warner, 937 F.2d 767, 774 (2d Cir. 1991), and has neither objected to the Court taking judicial notice of the documents nor contested their authenticity in any way.

Defendants have also asked the Court not to credit certain allegations about UTC's profitability and business that are contradicted by statements in the SEC filings, relying upon NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 149 n.1 (2d Cir. 2012) ("We assume those facts [in the complaint] to be true unless conclusory or contradicted by more specific allegations or documentary evidence." (citing Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009))).

Such an approach would be in direct contravention of the mandate from Roth to not consider the truth of the contents in SEC filings in these types of cases. Because Roth has been reaffirmed time and again by courts in this district, see, e.g., Ong v. Chipotle Mexican Grill, Inc., 294 F. Supp. 3d 199, 223 (S.D.N.Y. 2018), and the Court of Appeals for the Second Circuit, see, e.g., Morrison v. Eminence Partners II,

4

L.P., 714 F. App'x 14, 18 n.3 (2d Cir. 2017), the Court rejects Defendants' request.

Thus, except as otherwise noted, the factual background derives from the Second Amended Complaint and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on the Motion to Dismiss. See Spool, 520 F.3d at 183.

## B. FACTUAL BACKGROUND

### 1. UTC's Business and Defendants

UTC is a conglomerate technology and industrial company providing products for aerospace and building industries worldwide. By 2015, it employed hundreds of thousands of employees working on items such as plane parts and engines, helicopters, elevator systems, HVAC solutions and more.

Those separate businesses have specific subdivisions at UTC. Through some reorganizations before, during, and after the Class Period, the names and reporting structures for the subdivided businesses changed nominally but not much substantively. In relation to the Executive Defendants: Hayes is UTC's CEO, and was newly-appointed to that position shortly before the Class Period. He is self-described as "a naturally curious guy" and promised to "ask a lot of questions" upon taking the role. (Second Amended Complaint ¶¶ 5, 203.) Johri returned to UTC in January 2015 as its CFO. (See id. ¶ 22.)

Darnis ran a group known as "UTC Building & Industrial Systems" which encompassed (1) UTC's HVAC business known as Climate Controls & Security; and (2) Otis Elevator Company ("Otis"). (See id. ¶ 25.) Until 2015, Bellemare led UTC's Propulsion & Aerospace Systems, which encompassed (1) Pratt & Whitney; and (2) UTC Aerospace Systems ("UTAS"). (See id. ¶¶ 23, 33.) Throughout the Class Period, UTAS and its predecessors have been led at least in part by Gitlin. (See id. ¶¶ 24, 34-36.) Some of these subdivisions are quite large. In 2015, UTAS — which provides aerospace supplies and products — accounted for about $1.9 billion, or 25% of UTC's profits, and Otis accounted for $2.3 billion, or 32% of UTC's profits. (See id. ¶ 32.)

Working in these varied businesses has generally been a profitable enterprise for UTC. In 2014, UTC reported earnings per share ("EPS") of $6.80 on sales of over $65 billion — increases of 9% and 4% from 2013, respectively. (See "Form 8-K, Jan. 26, 2015," Dkt. No. 43 Ex. 2 at 7.)

However, the 2015 fiscal year was a bit bumpier than 2014. Although still profitable, UTC reported earnings per share of $6.30 on sales of $56.1 billion.[1] (See "Form 8-K,

---

[1]    Part of the drop in absolute terms year-over-year may have occurred because UTC also sold off its helicopter business, Sikorsky Aircraft Corporation in 2015. (See Second Amended Complaint ¶ 177.)

Jan. 27, 2016," Dkt. No. 43 Ex. 14 at 7.) This drop stemmed largely from difficulties in two specific subdivisions: UTAS and Otis. (Second Amended Complaint ¶ 2.) UTAS had difficulties regarding its "commercial aftermarket sales." (Id.) This is the market for replacement parts for aircraft after their sale to the consumer. Separately, Otis had difficulty with expanding its elevator business in China. (Id.)

Relying on the statements made by former employees of UTC and its subsidiaries, Kapitalforeningen alleges that these difficulties were communicated to and well-known by the Executive Defendants going into 2015. However, despite the alleged advanced warnings of these difficulties, according to Kapitalforeningen, Defendants repeatedly provided guidance to investors that UTC expected conservative growth across the company in 2015, including for the UTAS and Otis businesses. Kapitalforeningen alleges that these statements about UTC's 2015 projected financial targets were misleading and part of a "campaign to mislead investors as to UTC's business condition and future prospects." (Id. ¶ 3.)

## 2. Defendants' Allegedly Misleading Statements

### i. December 11, 2014 Statements

On December 11, 2014, Hayes reviewed the preliminary 2014 results and initial targets for 2015 in a call with

7

investors. (Id. ¶ 107.) For 2015, Hayes projected "earnings per share of somewhere between $7.00 and $7.20, that's 3% to 6% growth." (Id. ¶¶ 107-08.) He cautioned that "the business unit plans . . . are challenging" but also "achievable." (Id. ¶ 108.) Bellemare, president of a subdivision encompassing UTAS at that time, also projected that for UTAS, "[w]e expect very solid conversion on strong commercial [original equipment] and aftermarket volume. . . . So for UTAS, we see sales up mid-single digit and earnings up $225 million to $275 million." (Id. ¶ 109.)

For Otis, Darnis presented that "[w]e expect revenue to grow in all segments and geographies, and I'd say, upper end of the mid-single digit, call it 5% to 6%." (Id. ¶ 111.) He also said that "after several years of flat performance and declining share, Otis trajectory is trending positive." (Id. ¶ 112.) Analysts then asked for a bit more guidance on Otis's performance in China. In response, Hayes explained that he expected the conversion of backlogged orders — orders placed in prior periods for which customers have not fully paid yet — to provide growth, and he also offered that "I think the Chinese government will do what's necessary to support that growth." (Id. ¶¶ 34, 114.)

Darnis echoed Hayes's thoughts. For 2015, he anticipated "10% revenue growth in China" based on converting backlogged

orders and some order growth. (Id. ¶ 114.) He recognized that "China has been slowing" and that Otis was "flat" for the second, third, and likely fourth quarters of 2014. (Id.) He went further to point out that a "question mark . . . we're going to be watching closely" is that "China is clearly slowing down, and we're seeing that, and slowdown both in the backlog conversion and also the order rates." (See "Earnings Call Transcript, December 11, 2014," Dkt. No. 43 Ex. 3 at 12.)

   ii.  January 26, 2015 Statements

A month later, UTC presented its final 2014 financial picture and revised its 2015 outlook. UTC revised its 2015 forecast downward from between $7.00 and $7.20 to $6.85 to $7.05 per share. (Second Amended Complaint ¶ 121.) UTC changed its guidance due to a strengthening U.S. dollar and a falling discount rate for pension expenses. (Id.) Hayes still expressed that there was "momentum" heading into 2015, and that the "business fundamentals and operational expectations have not changed." (Id. ¶ 122.)

After UTC's Director of Investor Relations reported that UTAS aftermarket sales increased by 5% in the 2014 fourth quarter compared to 2013, he was asked about how the reported 5% growth compared to the projected high single-digit growth guidance for UTAS for 2015. (See "Earnings Call Transcript,

January 26, 2015," Dkt. No. 43 Ex. 4 at 4, 11; Second Amended Complaint ¶ 124.) Johri explained that the 2013 fourth quarter was "exceptionally strong" in that it rose 17% compared to the year before, so 5% growth on top of that for 2014 was "really not a change in our expectations" for 2015. (Earnings Call Transcript, January 26, 2015 at 11.)

Turning to Otis, Hayes was asked by an analyst whether the 10% growth for China was "still realistic." (Id. at 13.) Hayes said that "[i]t's certainly within the realm of possibility" and that he "wouldn't give up on this." (Id.; Second Amended Complaint ¶ 125.) He reiterated his hopes from December 2014 for converting order backlogs and additional order growth and pointed out that "[w]e've seen some [Chinese government] stimulus measures take hold, seen some bank lending regulations ease a little bit to try and, again, reinvigorate the property market." (Second Amended Complaint ¶ 125.)

iii. February 18, 2015 Statements

Only a few weeks later, speaking at Barclays' Industrial Select Conference, Hayes reaffirmed that UTC was "on the right track" to meet its revised guidance and expected "commercial businesses to grow 5% to 6% organically." (Id. ¶¶ 131-32.)

iv.   March 12, 2015 Statements and Darnis's Stock Sale

The following month, UTC held its 2015 annual investor analyst meeting. (Id. ¶ 136.) Although Hayes explained there was "no change" to the prior guidance, UTC cautioned investors repeatedly throughout.

For UTAS, Gitlin explained that "commercial aftermarket sales and orders were a bit weaker than we expected. So commercial aftermarket is a watch item for us in the first quarter." (See "Investor Call Transcript, March 12, 2015," Dkt. No. 43 Ex. 5 at 12.) He also provided details on what led to this decline: there were "fewer new 787 operators" and airlines were being "very disciplined" and "not necessarily ordering more parts or provisioning." (Id. at 12-13.) Gitlin still anticipated that UTAS would meet "full-year expectations" but it was based, in part, on the expectation of being "a bit back-end loaded." (Id.; Second Amended Complaint ¶ 137.) Ultimately, Gitlin said that "[c]ommercial aftermarket fundamentals are strong" and "we should see continued strong commercial aftermarket growth." (Second Amended Complaint ¶ 139.)

There was similar caution about the Otis business. Darnis began by noting that "after several years of flat performance and some share loss, the Otis trajectory is turning positive." (Id.; Investor Call Transcript, March 12,

11

2015 at 29.) But this was accompanied by "some challenges
. . . [because] the growth of the China elevator market . . .
is slowing [as] evidenced by our slower order growth over the
last three quarters." (Investor Call Transcript, March 12,
2015 at 29.) He continued by remarking that these challenges
"are the largest risk to our 2015 expectation." (Id.) Still,
Darnis thought Otis would hit its 2015 targets because, after
a "soft" first quarter, it would "see some improvement
throughout the year." (Id. at 30.) Overall, Darnis said he
felt "good that, overall, for the year, we're going to end up
in our mid-single digit [sales growth] range." (Second
Amended Complaint ¶ 140.) This was because "the momentum on
share has turned." (Id. at 23; Second Amended Complaint ¶
140.)

Analysts and investors asked follow up questions about
the 2016 prospects in China. Darnis explained that for 2015,
"we've assumed we're going to grow orders at a rate of GDP"
and that if there were no "growth in orders going to 2016"
then there would be "no growth on the sales side" but that it
was "not really going to be an issue for" 2015. (Id. ¶ 142;
Investor Call Transcript, March 12, 2015 at 38.) Finally,
Johri concluded by stating that UTC anticipated being at the
low end of earnings per share growth of 0% to 3%. (Investor
Call Transcript, March 12, 2015 at 40.)

One day after the analyst meeting, Darnis exercised options to acquire more than 300,000 shares of UTC stock and immediately sold them for more than a $19 million profit. (Second Amended Complaint ¶ 215.)

### v. March 18, 2015 Statements

Only a few days after the conference, Johri spoke at the Bank of America Merrill Lynch Global Industrials Conference. He affirmed that "2015 is on track of what we said in January" and that "operationally, everything, [is] as we expected, things [are] moving along exactly in line with what we thought." (Id. ¶ 149.) He was also asked by analysts about the downturn in construction in China, and stated that "it's not an issue for 2015 as much" given the order backlog. (Id. ¶ 150.)

### vi. April 21, 2015 Statements

UTC presented its 2015 first quarter results about a month later. It announced that sales grew about 3% over the prior year and reaffirmed its full-year guidance. (Id. ¶ 154.) In its accompanying press release, Hayes stated that "the fundamentals of all of our businesses remained solid." (Id.) He noted that "commercial aerospace aftermarket growth was slower . . . than we anticipate for the year." (Id.) On UTAS, Johri similarly noted the "soft start" to the aftermarket sales for the year before reaffirming the prior guidance.

(Id. ¶ 156.) Johri also touched on Otis and stated that they "feel we can get to the low end of the range at least." (Id. ¶ 157.) He said they would be "watching" the "China new equipment market." (Id.)

####### vii. May 19, 2015 and June 4, 2015 Statements

At a trade group conference on May 19, 2015, Hayes once again reaffirmed "UTC's overall guidance for 2015." (Id. ¶ 168.) He said he was "not that concerned about 2015 for UTC in China" given the backlog of sales. (Id. ¶ 169.) Johri spoke at another trade group conference on June 4, 2015 and similarly reaffirmed the slow start but said that they "still feel good about where we are." (Id. ¶ 173.)

####### viii. June 15, 2015 Statements

The last set of alleged misstatements about UTC's performance come from the June 15, 2015 Paris Air Show Analysts and Portfolio Managers Meeting, where UTC announced its plan to divest itself of Sikorsky. (Id. ¶ 177.) After accounting for the removal of Sikorsky, UTC reiterated in a press release that it "continues to expect organic sales growth of 3% to 5%." (Id.) As in the prior calls, Gitlin noted that he expected UTAS's "commercial aftermarket to be back-end loaded in the year." (Id. ¶ 180.)

Gitlin delved further into the commercial aftermarket numbers. He explained that the 2015 guidance was "premised on

14

commercial aftermarket being up in the high single digits, but it will not be up in the high single digits." (See "Investor Call Transcript, June 15, 2015," Dkt. No. 43 Ex. 9 at 7.) He attributed this assessment to the market being "weaker than we expected." (Id.) Thus, commercial aftermarket was now "the question mark for the year." (Id.) In response to questions, Gitlin explained how commercial aftermarket is broken up into three "buckets": spare parts, provisioning, and repair. (Id. at 8.) Gitlin explained how the year had progressed in each bucket and the challenges UTC faced in provisioning and repair. (Id.)

Johri also briefly touched on Otis. He said that "China has slowed down" and that "orders continue to be down year-over-year" which was "bad news." (Id. at 15.)

### 3. July 21, 2015 Earnings Call and Aftermath

About a month later, UTC announced its second quarter earnings and once again lowered its guidance for 2015, down to $6.15 to $6.30. (Second Amended Complaint ¶ 177.) These revisions were made after reviewing "six months of trends" on the UTAS commercial aftermarket sales and "a slowing China" for Otis. (Id.) Following the announcement, UTC's stock traded down 7.03%. (Id. ¶ 196.)

Hayes offered reasons for why UTC missed its financial targets. He said "[a]fter half a year of actual results, it's

15

clear that the commercial aftermarket assumptions that our Aerospace Systems business used were overly optimistic." (Id. ¶ 190.) He also said after two years of strong growth in commercial aftermarket sales, "I think we just assumed that we were going to continue to see that kind of growth." (Id. ¶ 191.) As an example misstep, Hayes said that, based on airline plans, UTC anticipated more business related to Boeing Company's ("Boeing") 787 aircraft and also had not expected airlines to carry a "high level of inventory" for provisioning. (See "Earnings Call Transcript, July 21, 2015," Dkt. No. 43 Ex. 13 at 8-9.) Ultimately, Hayes put the onus of being "way too aggressive" on the UTAS projections on himself, stating:

> But I'll tell you that probably the root cause is we pushed the Aerospace Systems guys to have a plan that was going to be up roughly $300 million for the year. And in order to do that, they had to push the aftermarket guys to deliver a much bigger number. And at the end of the day, I don't think there was a strong basis in that aftermarket assumption around how we were going to get there. They were looking at trends, but I don't think we delved deep enough into — or we didn't question enough the assumptions underlying how they were going to get there. And so I would tell you that's a miss on my part, that's a miss on our part from a planning perspective that we didn't dig deep enough last year when these plans were getting put together.

(Id. at 10-11; see also Second Amended Complaint ¶¶ 191-93.)

Johri also explained the revised guidance for Otis. Consistent with the prior calls, he said there was a

"significant slowdown of construction markets in China" and a "slowdown in the rate of backlog conversion." (Second Amended Complaint ¶ 190.)

Hayes also explained why UTC did not revise its guidance in June when it announced the Sikorsky sale although it "could have." (Id. ¶¶ 104, 194) Regarding UTAS, he said that Gitlin "had some plans in the back half of June in terms of orders that he expected to get that he didn't get; and quite frankly, it was a lot worse than I think [Gitlin] or anybody else expected when he stood up in June." (Earnings Call Transcript, July 21, 2015 at 11.) And for Otis, he explained that "I think that we were still hoping for some recovery, better news out of China in June. It's a big month for orders." (Id.)

### 4. Analyst Reports

After many of these calls, analysts issued reports generally expressing confidence in UTC's guidance through the year and its ability to hit the projected targets. For example, after Hayes was appointed, an analyst believed Hayes "clearly examine[d] the assumptions of [UTC's] operating units." (Second Amended Complaint ¶ 5.) In March, April, and June, analysts wrote encouragingly that UTC reiterated its earnings per share guidance each time. (Id. ¶¶ 147, 160, 161, 174, 181.) However, after the final revision to UTC's guidance

for the year in July, an analyst described the adjustment as "more than a major surprise." (Id. ¶ 14.)

### 5. Former Employee Reports on Difficulties

Kapitalforeningen presents ten unnamed former employees of UTC and its subsidiaries (the "Former Employees") who were involved with or had insight into UTAS and Otis difficulties during or before the Class Period. The first six Former Employees describe the difficulties relating to UTAS and aftermarket commercial sales, and the others address the difficulties facing Otis. At a high level, Kapitalforeningen alleges that UTC knew about the difficulties described below and failed to disclose them while making its earnings projections.

#### i. Former Employee One ("FE 1")

FE 1 is one of the main witnesses referenced in the Second Amended Complaint. FE 1 was a Senior Executive in Inertial, Control & Aircraft Management Systems ("ICAMS"), which is a unit of UTAS's Sensors and Integrated Systems division ("SIS"), for part of the Class Period, specifically from January 2013 through May 2015. (Second Amended Complaint ¶ 36.) SIS is one of eight UTAS divisions.[2] (See "UTAS

---

[2]     The parties have not provided an organizational chart for UTC. For simplicity and clarity, the Court will use the following taxonomy to delineate most entities: entities such as UTAS and Otis will be referred to as "subdivisions" of UTC, entities such as SIS, that make up UTAS will

Presentation, March 12, 2015," Dkt. No. 43 Ex. 17 at 2.) As part of his role, FE 1 "was involved in preparing sales and profits projections for ICAMS." (Second Amended Complaint ¶ 37.) FE 1 reported to Brian Sartain, a vice president at SIS. (Id. ¶ 36.) Sartain, in turn, reported to SIS president Justin Keppy, who reported to and briefed some of the Executive Defendants as well as other intermediate managers. (Id.) Thus, throughout the Class Period, at least two levels of management separated FE 1 from any Executive Defendant, specifically Bellemare and Gitlin. (See id. ¶¶ 36, 37.)

According to FE 1, the commercial aftermarket business had "deteriorated significantly" to be off by as much as 40%-50% during the 2013-2014 period compared to earlier periods. (Id. ¶ 38.) Although FE 1 worked within only one unit within one UTAS division, ICAMS was alleged to have been the "largest component of SIS sales and profits" and SIS contributed either 75% of UTAS's profit or "at least had to have been a major contributor" to UTAS's profits. (Id. ¶ 39.)

FE 1 provided a few reasons for this market deterioration. First, airlines began to stockpile inventory. (Id. ¶ 40.) Second, Boeing - a major client - launched a

---

be referred to as "divisions," and entities such as ICAMS, that make up SIS will be referred to as "units."

partnership program in 2012 requiring vendors like UTC to cut prices. (Id. ¶¶ 41-43.) Third, airlines began forming groups to pool purchasing power of spare and replacement parts, and thus obtained better prices on parts. (Id. ¶¶ 44-45.) Finally, airlines were buying more counterfeit parts, and correspondingly fewer parts from UTC. (Id. ¶¶ 46-47.)

FE 1 attended meetings within ICAMS discussing these trends and "their adverse impact on UTAS commercial aftermarket sales" and "UTAS's other business units." (Id. ¶¶ 48-49.) FE 1 recalled "discussions in 2014" among Sartain and other SIS leaders, and a meeting in March or April 2014, including both Keppy and Sartain, during which Keppy recognized these difficulties "plaguing commercial aftermarket sales." (Id. ¶ 49.) FE 1 is not alleged to have been present for this meeting.

FE 1 also discussed these difficulties with colleagues at meetings. Specifically, FE 1 regularly attended "SIS Operational Reviews" meetings, attended by members of both ICAMS and a "Maintenance, Repair and Overhaul" unit. (Id. ¶ 50.) The difficulties discussed at these meetings were eventually raised with Bellemare "and other members of UTAS Senior Corporate Leadership" through meetings that "built upon each other" in the following way: ICAMS briefed Sartain, then Sartain briefed Keppy, and finally Keppy briefed Michael

Dumais (another senior manager who was a level below Gitlin),
Bellemare and Gitlin. (Id. ¶ 51.) "FE 1 attended a few such
briefings to Defendant Bellemare during his tenure" but it is
unstated whether the difficulties were discussed at the
meetings FE 1 attended. (Id.) Keppy was separately
responsible for distilling information in months that SIS
missed sales and profit targets for eventual briefing to
Bellemare. (Id. ¶ 97.)

FE 1 also incorporated these difficulties into his
projections for management regarding the 2015 financial
targets, as did other ICAMS units. (Id. ¶ 52.) Keppy then
presented these targets to Gitlin, Bellemare, and Dumais.
(Id.) However, after Keppy presented the targets, he received
revised projections "rejecting" ICAMS's plans and reflecting
larger increases in sales which various team members viewed
as "unrealistic." (Id. ¶¶ 52-53.) Keppy eventually provided
the revised projections to Sartain, who passed them on to
FE 1 and his team. (Id.)

According to FE 1, employees from other SIS units
reported similar frustrations with their business targets.
(Id.) Even more broadly, FE 1 believed that "UTAS's other
business units also had unrealistic targets imposed upon them
by UTAS management." (Id. ¶ 60.) FE 1 learned from Sartain
that when a UTAS executive argued about the targets, Bellemare

told him to "get on board or we will find someone who will."
(Id. ¶ 54.)

    ii.   Former Employees Two Through Five

Kapitalforeningen includes statements from Former Employees two through five to bolster FE 1's claims. Former Employee Two ("FE 2") was a "SIS Senior Manager" during the Class Period. (Id. ¶ 45.) FE 2 described some of the same reasons why aftermarket sales were declining and how that impacted his projections that were presented to management through a similar "bottom-up" mechanism as FE 1 described. (Id. ¶¶ 45, 57.) FE 2 was not involved in any of the presentations of these projections to the Executive Defendants, but, like FE 1, FE 2 also received higher targets back from SIS senior management. (Id. ¶¶ 58, 59.) Once the targets were set, FE 2 met monthly with SIS executives "to discuss performance and variances against" those targets. (Id. ¶ 99.)

Former Employee Three ("FE 3") is described as a former "Procurement Manager" at UTAS prior to and throughout the Class Period, who corroborates FE 1's claim that counterfeits "also had a negative impact on commercial aftermarket sales." (Id. ¶ 47.) FE 3 also attended monthly "all hands" meetings on the performance of his group, where there were slides

"which reflected an overall decline in UTAS commercial aftermarket performance." (Id. ¶ 95.)

Former Employee Four ("FE 4") is a "senior financial executive" within one of SIS's other units, Kidde, and stated that the targets given to him for 2015 were "unrealistic." (Id. ¶ 55.) FE 4 said that the 2015 projection process differed from the typical, historical "give-and-take" and that management threatened that those who could not hit targets would lose their jobs or be moved out of the unit. (Id. ¶ 56.) FE 4 also described the Hyperion Financial Management System, "which was the consolidator of all of UTC's financial data from around the world." (Id. ¶ 94.) According to FE 4, Kidde forecast information was put into this consolidator, which was rolled up into reports about SIS and eventually UTAS, and was available to "all C-Suite executives." (Id.)

Former Employee Five ("FE 5"), an "Aftermarket Demand Planner" also in Kidde, expressed similar negative sentiments about the 2015 targets. (Id. ¶ 55.) He too, described regular meetings and a weekly "business-in-hand" report regarding aftermarket sales that were circulated to Keppy and "SIS headquarters." (Id. ¶¶ 75-76, 210.)

### iii. Former Employee Six ("FE 6") and "Pulling In" Sales

FE 6 is another key witness to the difficulties that were facing UTAS. FE 6 was a manager within the "Business Development and Strategy" group at UTAS. (Id. ¶ 61.) This group was responsible for developing the aftermarket services sales growth analysis for 2015. (Id.) FE 6 explained that for the 2015 year, the "bottom-up" and "pressure-test[ed]" analysis projected "low to mid-single digit growth forecast for commercial aftermarket services." (Id. ¶¶ 62-64.) This projection was based on similar difficulties that FE 1 noticed, such as a "lower amount of 787 provisioning" for Boeing's 787. (Id.) Also similar to FE 1, FE 6 explained the reporting structure whereby these projections were eventually presented to Gitlin after two or three levels of review — FE 6 was not present for the discussions with Gitlin. (Id. ¶¶ 63-65.) And again similar to FE 1 and other Former Employees, FE 6 later learned that management "rejected" his forecast. (Id. ¶ 70.)

After that, according to Kapitalforeningen "FE 6 and his staff began devising strategies to attempt to meet the management-imposed projected growth rate." (Id. ¶ 71.) This was done in part through the long-time practice of "pulling in" or accelerating sales from future quarters into the current quarter "creating the illusion of growth." (Id. ¶

72.) FE 4 described this practice as "unsustainable" because "[w]ithout an ever-expanding future pool of sales to draw from at some point, there is nothing left to pull from." (Id.) FE 4, FE 5, and FE 6 each reported that there existed some "pulling in" of sales in their units every quarter. (Id. ¶¶ 55, 73-74.) FE 5, who started in October 2014, specified that within his SIS unit, "for a period of time . . . they were able to pull in approximately $2 million in sales from forward months into months they were short" but this stopped "during the first or second quarter of 2015." (Id.)

### iv. Former Otis and Otis Subsidiary Employees

The remaining four Former Employees mentioned in the Second Amended Complaint worked for Otis or unnamed Otis subsidiaries. Kapitalforeningen alleges that they support allegations that Otis was losing market share in China through 2015 and that Otis relied upon an undisclosed and unsustainable practice of taking fake orders. Former Employee Seven ("FE 7"), a "sales contract reviewer" at Otis in Shanghai, "recalled elevator accidents" adversely affecting Otis sales. (Id. ¶ 80.) FE 7 also asserted sales declined in 2014 due to "deteriorating construction markets," and saw discounts up to 40% on contracts signed in 2014, which were larger than the 20% discount typically given. (Id. ¶¶ 81, 83.) Former Employee Eight ("FE 8") was a "senior manager" at

25

two Otis subsidiaries and similarly recalled a loss of market shares due to accidents, which "was reported to Otis management through situation reports." (Id. ¶ 80.)

Former Employee Nine ("FE 9") was the former "head of sales" at "Otis in Shanghai, China." (Id. ¶ 81.) He also recalled a major accident impacting Otis sales and that generally sales declined in China throughout 2013 and 2014. (Id.) FE 9 viewed Otis's products as more expensive, and inferior in terms of quality and specifications as compared to competitors' products, which made attracting new business difficult. (Id. ¶ 83.)

Former Employee Ten ("FE 10") was another sales manager in China, and recalled a market "slow down" that "senior management must" have known about given access to sales data and regular sales team meetings. (Id. ¶ 81.)

FE 7, FE 8 and FE 10 also described the practice of "Fake and Specially Approved" orders at Otis in China. "Fake" orders are, as the name implies, orders that would never be realized. (Id. ¶ 87.) "Specially Approved" orders are orders that sales people closed but for which Otis did not receive a deposit on. (Id. ¶ 88.) FE 8 estimates that "15-20%" of the order backlog "could be comprised" of fake orders. (Id. ¶ 87.) FE 7 believed there were "a lot" of "Specially Approved" orders at the end of 2014. Kapitalforeningen alleges that statements

about Otis's performance were misleading in part because they failed to disclose these practices. (See, e.g., id. ¶ 118.)

## C. PROCEDURAL BACKGROUND

Kapitalforeningen brought a putative class action on May 12, 2017 on behalf of stock purchasers and acquirers, and the case was assigned to the Honorable Judge John G. Koeltl. Kapitalforeningen claims Defendants made fraudulently false statements or omissions in violation of Section 10(b) ("Section 10(b)") of the Exchange Act, as well as claims against the Executive Defendants for control person liability under Section 20(a) ("Section 20(a)") of the Exchange Act. After the appointment of counsel and lead plaintiff, Kapitalforeningen filed an amended complaint in November 2017. (See Dkt. Nos. 27, 31.) Then, Defendants filed the Motion to Dismiss on December 11, 2017. (See Motion to Dismiss.) Within the next month, the case was reassigned to this Court and Kapitalforeningen filed the Second Amended Complaint.

After the filing of the Second Amended Complaint, Defendants sought permission to file a new motion to dismiss, and the Court directed them to its letter-writing practice outlined in the Court's individual rules. (See Dkt. No. 48.)

Defendants wrote to Kapitalforeningen detailing their arguments about the Second Amended Complaint's infirmities,

largely reiterating the arguments in support of the Motion to Dismiss. ("Def. January 24 Letter," Dkt. No. 49.) Kapitalforeningen responded (see "Pl. January 30 Letter," Dkt. No. 50) and UTC notified the Court that the parties could not resolve their differences. ("Def. February 6 Letter," Dkt. No. 54.)

The Court now construes Defendants' letters described above as a renewed motion to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6).

## II. **LEGAL STANDARDS**

### A. RULE 12(B)(6) MOTION TO DISMISS

Defendants argue that the Second Amended Complaint should be dismissed because it fails to state a claim for which relief can be granted under Rule 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the

28

speculative level." Twombly, 550 U.S. at 555. The task of a
court in ruling on a motion to dismiss is to "assess the legal
feasibility of the complaint, not to assay the weight of the
evidence which might be offered in support thereof." In re
Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574
(S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub
nom. Tenney v. Credit Suisse First Boston Corp., No. 05
Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006).

The Court must accept all well-pleaded factual
allegations in the complaint as true, and draw all reasonable
inferences in the plaintiff's favor. See Chambers v. Time
Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). However,
plaintiffs claiming fraud, including securities fraud cases
about material misstatements and omissions, must satisfy the
heightened pleading requirements of Federal Rule of Civil
Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity
the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

B. THE EXCHANGE ACT

Kapitalforeningen brings two claims. One is against
Defendants for misrepresentations or omissions of material
fact in violation of Section 10(b) of the Exchange Act and
Rule 10b-5 ("Rule 10b-5") promulgated thereunder, 17 C.F.R.
Section 240.10b-5. The second is brought solely against the

Executive Defendants under Section 20(a) of the Exchange Act for control person liability. 15 U.S.C. § 78t(a).

Defendants argue that (1) management's projections and affirmations of guidance are forward-looking statements protected by the statutory PSLRA safe harbor and "bespeaks caution" doctrine; (2) the statements are unactionable opinion statements; and (3) Kapitalforeningen did not adequately allege scienter. (See Def. February 6 Letter; "Def. Memo," Dkt. No. 44 at 2-3.)

To successfully bring a claim under Section 10(b) and Rule 10b-5,[3] "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." Solow v. Citigroup, Inc., 507 F. App'x 81, 82 (2d Cir. 2013); see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). As

_____

[3]     Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, provides that it is unlawful, in connection with the purchase or sale of any security, "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit . . . ." 17 C.F.R. § 240.10b-5. Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market manipulation.

outlined below, certain elements of these claims are further defined by the PSLRA's amendments to the Exchange Act enacted in 1995.

"Section 20(a) of the Exchange Act imposes derivative liability on parties controlling persons who commit Exchange Act violations." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016) (internal quotation marks omitted). "[T]o establish a prima facie case . . . a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (internal quotation marks omitted).

### 1. Misstatements or Omissions of Material Fact

The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b); see also Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004).

An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time

Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).
Although "Rule 10b-5 imposes no duty to disclose all material,
nonpublic information, once a party chooses to speak, it has
a 'duty to be both accurate and complete.'" Plumbers' Union
Local No. 12 Pension Fund v. Swiss Reinsurance Co., 753
F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting Caiola v.
Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002)).

    2. Scienter

Scienter is defined as "a mental state embracing intent
to deceive, manipulate, or defraud," Tellabs, Inc. v. Makor
Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal
quotation marks omitted). Plaintiffs must "state with
particularity [the] facts giving rise to a strong inference
that the defendant acted with the required state of mind. To
satisfy this requirement, a complaint may (1) allege facts
that constitute strong circumstantial evidence of conscious
misbehavior or recklessness, or (2) allege facts to show that
defendants had both motive and opportunity to commit fraud."
Rombach, 355 F.3d at 176 (internal citations and quotation
marks omitted).

Ultimately, "a complaint will survive . . . only if . . .
the inference of scienter [is at] least as compelling as any
opposing inference one could draw from the facts alleged. In
determining whether a strong inference exists, the

allegations are not to be reviewed independently or in isolation, but the facts alleged must be taken collectively. The 'strong inference' standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered." Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010) (internal citations omitted).

### 3. PSLRA Safe Harbor

The PSLRA also contains a safe harbor provision that raises elements of the pleading standard even higher from the requirements set out above in certain circumstances. The PSLRA safe harbor provision applies to "forward-looking statements" which include "statement[s] containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items and a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . ." See Slayton, 604 F.3d at 766-67 (internal quotation marks omitted). Under the PSLRA, parties "shall not be liable with respect to any forward-looking statement," 15 U.S.C. Section 77z-2(c), to the extent that they can show that: (1) the statements were accompanied by meaningful cautionary language; (2) the statements were immaterial; or (3) the plaintiff failed to prove the statements were made with actual

33

knowledge that they were false or misleading. See Slayton,
604 F.3d at 766.

In evaluating whether cautionary language is adequate,
courts must "identify the allegedly undisclosed risk and then
read the allegedly fraudulent materials — including the
cautionary language — to determine if a reasonable investor
could have been misled into thinking that the risk that
materialized and resulted in his loss did not actually exist."
In re Focus Media Holding Ltd. Litig., 701 F. Supp. 2d 534,
541 (S.D.N.Y. 2010) (internal quotation marks omitted); see
also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d
Cir. 2002).

### 4. Opinion Statements

When the alleged misstatements or omissions are made
within the context of statements of opinions, plaintiffs are
also required to show that "(1) the speaker d[oes] not hold
the belief . . . professed; (2) the fact[s] [ ] supplied in
support of the belief professed are untrue; or (3) the speaker
omits information that makes the statement misleading to a
reasonable investor." Tongue v. Sanofi, 816 F.3d 199, 210 (2d
Cir. 2016) (citing Omnicare, Inc. v. Laborers Dist. Council
Contr. Indus. Pension Fund, 135 S. Ct. 1318 (2015)).

34

### III. **DISCUSSION**

Kapitalforeningen alleges a "fraud by hindsight" theory of liability that the Second Circuit has repeatedly rejected. E.g., Denny v. Barber, 576 F.2d 465, 471 (2d Cir. 1978) (Friendly, J.). This conclusion is clearest in the context of evaluating Kapitalforeningen's scienter allegations, which are insufficient to state a Section 10(b) fraud claim regardless of whether the statements at issue are classified as opinion statements, forward-looking statements, or otherwise. However, because the Court finds that nearly all the statements are also opinion statements that are not misleading, Kapitalforeningen also fails to state a claim on those grounds.

A. SCIENTER

Kapitalforeningen fails to allege particularized facts giving rise to a "strong inference" that any Defendant acted with scienter. As noted above, Kapitalforeningen must allege either (1) Defendants had both motive and opportunity to commit fraud or (2) the existence of sufficient circumstantial evidence of conscious misbehavior or recklessness. Rombach, 355 F.3d at 176.

1. Motive and Opportunity

On the first factor, "motives that are common to most corporate officers . . . do not constitute motive for the

purpose[ ]" of establishing scienter. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted). The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. See, e.g., In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired."). Defendants do not contest that there was an opportunity to commit fraud. However, they argue that not only does Kapitalforeningen fail to allege any theory or motive, but Defendants actually faced the exact opposite incentives. Specifically, Defendants point out that according to SEC filings, the Executive Defendants' bonuses were tied partly to UTC's ability to hit projected earnings per share numbers, and thus were not paid out in 2015. (See Def. Memo at 28; Dkt. No. 43 Ex. 19 at 37-42.) They also argue that UTC would not have engaged in stock repurchasing if it knew the stock was inflated. (See Def. Memo at 28-29.)

36

Kapitalforeningen makes only one allegation, pertaining solely to Darnis (who was the leader of the subdivision containing Otis), that implicates the motive prong. At first glance, it is not trivial: Darnis sold over 300,000 shares of stock for a $19 million profit on March 13, 2015, the day after a call with analysts. (Second Amended Complaint ¶ 215.) SEC filings from the sale date show he still retained options on over 630,000 shares, which were also worth tens of millions of dollars. (See March 13, 2015 UTC Proxy Statement at 52.) Darnis is the only Executive Defendant alleged to have sold stock during the Class Period, and he announced his retirement only weeks after the Class Period ended. (Second Amended Complaint ¶ 25.)

"[T]he motive showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." ECA, Local 134 IBEW, 553 F.3d at 198 (internal quotation marks omitted). On the other hand, "a significant stock sale by just one corporate insider is insufficient to support such an inference." See, e.g., In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (collecting authority); In re eSpeed, Inc. Sec. Lit., 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he dispositive factor [regarding motive] is that other insiders, including two other individual defendants, did not sell during the

putative class period."). That situation is precisely the case here. Darnis is the only one of five Executive Defendants to have made any such sales and he still retained millions worth of stock options after his sale. This circumstance is therefore insufficient to show motive as required under the PSLRA.

Kapitalforeningen attempts to differentiate DRDGOLD by arguing that scienter can be adequately alleged even in cases with insider buying. (Pl. January 30 Letter at 3 (citing In re MF Global Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 306, 320 (S.D.N.Y. 2013)).) But there, the Court ultimately relied upon the conscious misbehavior or recklessness prong to support its scienter finding, not the motive prong. MF Global Holdings, 982 F. Supp. 2d at 306. As discussed below, Kapitalforeningen does not adequately plead scienter under that prong either.

## 2. Conscious Misbehavior or Recklessness

The other way to plead scienter is to allege "conscious misbehavior or recklessness." "[T]he strength of the circumstantial allegations must be correspondingly greater if there is no motive." ECA, Local 134 IBEW, 553 F.3d at 199 (internal quotation marks omitted). Thus, a plaintiff pleading the "conscious misbehavior or recklessness" theory of scienter must allege conduct that is "highly unreasonable

and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

There are at least four methods where circumstantial evidence can support an inference of scienter, including allegations that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted).

The Court addressed the first method above in regards to motive, where it is typically assessed despite its inclusion within the conscious misbehavior or recklessness prong. E.g., ECA, Local 134, 553 F.3d at 198 ("In order to [show] motive and opportunity to defraud, [p]laintiffs must allege that [defendants] benefitted in some concrete and personal way from the purported fraud." (internal quotation marks omitted)); Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (finding motive and that

defendants "benefitted in a concrete and personal way" simultaneously). Further, Kapitalforeningen makes no allegations or arguments that go to the second or fourth methods.

Turning to the third method, the Second Amended Complaint contains three categories of relevant allegations. The first category is that Defendants "admitted" that they had no factual basis for the earnings guidance. (See, e.g., Second Amended Complaint ¶¶ 211-13.) Next, Kapitalforeningen alleges that Former Employees provided contrary information indicating UTAS's and Otis's difficulties when forecasting 2015 sales figures, and Defendants received that information. (Id. ¶¶ 48-70, 94-100.) Finally, Kapitalforeningen alleges that Defendants had access to various systems and reporting mechanisms containing the relevant contrary information. (Id. ¶¶ 203-09.) These allegations, even when considered together, do not sufficiently plead scienter.

    i.  Category One: Hayes's Admissions

The allegations in the admissions category do not support the contention that Defendants acted with scienter when making the alleged misstatements. These allegations rely on the statements made in July 2015 when UTC lowered the guidance for the 2015 financial targets once again. These statements were made exclusively by Hayes during his

evaluation of what UTC could have done to discover the issues earlier in the year. As Kapitalforeningen highlights, Hayes (and UTC) wrongly "assumed" commercial aftermarket sales would grow. (Second Amended Complaint ¶¶ 211-13.) He said he did not "think we delved deep enough" or "dig[ged] deep enough" into the assumptions of the commercial aftermarket sales growth. (Id.) Kapitalforeningen alleges that these are admissions that Defendants "necessarily knew they had not questioned the underlying assumptions or delved into how UTC was actually going to achieve the unrealistic guidance." (Pl. January 30 Letter at 3.)

But these are retrospective observations that "became apparent" to Hayes only after he "met with the folks at UTAS and [] met with the Otis team." (Earnings Call Transcript, July 21, 2015 at 7.) Thus, Hayes was not admitting that when he spoke in December 2014 or January 2015 that he knew at that time that UTC had not "delv[ed] deep enough," nor is it reasonable to infer he meant to say that. The closest statement to such an admission is that Hayes said UTC "could have" adjusted the 2015 guidance during the June 15, 2015 Sikorsky announcement. (Second Amended Complaint ¶ 212.) But even that ambiguous statement ignores the context that Defendants were still expecting orders "in the back half of

June" which did not materialize in an unexpected way. (Earnings Call Transcript, July 21, 2015 at 11.)

None of these statements are actual admissions of prior knowledge or reckless conduct. Arguably, at best they may be relevant to an allegation of negligent conduct. In re Nokia Oyj (Nokia Corp.) Sec. Litig. is instructive in this regard. Defendant Nokia — at the time a large cell phone manufacturer — and its executives faced similar false statement claims under Section 10(b) and Rule 10b-5. See 423 F. Supp. 2d 364 (S.D.N.Y. 2006). After a few quarters of growing sales in the early 2000s, Nokia projected continued increases in sales for its next quarter. Id. at 359-60. In fact, sales declined that quarter, the stock dropped 16% in a day, and defendants were accused of withholding information that its recent positive performance and sales growth was "aberrant" and likely to end soon. Id. In support of their scienter allegations, plaintiffs alleged that Nokia's CEO "admitted" that he knew Nokia's products were "not competitive" because the CEO stated "we saw early on last year that what might be happening is that we are not fully competitive, so certainly we have started to take measures." Id. at 404-05.

The Honorable Judge Kenneth Karas of this Court held that this statement did not support scienter. Id. Instead, the "statement merely suggests that, at the time, there was

some level of internal concern that a segment of Nokia's products were not as competitive as Nokia wished." Id. at 405. The court reasoned that, because the defendants there "took action . . . to fix some of its problems" they had cause to be optimistic and "the fact that, in retrospect, such optimism may have been too optimistic does not retroactively make Nokia's prior statements knowingly false, in particular when defendants' wishful statements were not worded as guarantees." Id.

Unlike the Nokia CEO who acknowledged doubts existing in prior periods, Hayes never made any admissions of doubts as to his prior opinions. Instead, Hayes's statements during the Class Period and alleged admissions show, at most, that UTC and the Executive Defendants similarly shared both concerns and optimism about the business. Like the Nokia CEO, Hayes and the other Executive Defendants had concerns about commercial aftermarket sales during the first half of the year – concerns which they shared with analysts as they uncovered information. But the Executive Defendants were also similarly optimistic about orders in the second half of the year that never materialized. Holding these two beliefs does not make their statements about the projected sales knowingly or recklessly false. Thus, the Court finds that the

43

allegations in the admissions category fail to allege
scienter.

### ii. Categories Two and Three: Former Employees and Reporting Mechanisms

In support of the second and third categories of
allegations, Kapitalforeningen argues that Defendants had
access to or received the various opinions, reports and
systems that the Former Employees describe in the Second
Amended Complaint, and that these items contained facts
contrary to Defendants' public statements about UTC's
performance. (Second Amended Complaint ¶¶ 94-100, 201, 203-
210.)

As a threshold matter, Defendants ask the Court to
discredit or discount the Former Employees due essentially to
their anonymity. (Def. Memo at 23.) That is not the standard
in the Second Circuit. Allegations may rest on information
provided by anonymous sources, like the Former Employees,
when they "are described in the complaint with sufficient
particularity to support the probability that a person in the
position occupied by the source would possesses the
information alleged." Novack, 216 F.3d at 314. Pursuant to
Rule 9, when alleging the existence of reports and meetings
containing contrary facts, plaintiffs "must specifically
identify the reports or statements containing this

44

information." Id. at 309. For example, the Court has previously found scienter when confidential witnesses (1) circulated reports with the relevant contrary information directly to defendants; (2) attended meetings about the issues with defendants or immediate subordinates; and (3) supported allegations of "widespread knowledge" of problems. See Cornwell v. Credit Suisse Grp., 689 F. Supp. 2d 629, 637- 39 (S.D.N.Y. 2010); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir. 1996) (quoting similar language in First Circuit and Seventh Circuit cases regarding the specificity of information complaints must contain about reports and figures to state a claim); Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010) (finding scienter adequately pled when confidential witnesses "had first-hand interactions with the defendants" including reporting of specific risks); DRDGOLD, 472 F. Supp. at 572 (finding no scienter and identifying no conversations or reports "reviewed by any specific individuals . . . on any specific dates" containing contrary facts); Steinberg v. Ericsson LM Tel. Co., No. 07 Civ. 9615, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (finding no scienter in part because "all three of [p]laintiff's confidential sources were mid-level managers in the United States who claim no contacts or communications

45

with [d]efendants, or even with [defendant's] European corporate headquarters").

Turning to the allegations themselves, the second and third categories of scienter allegations are deficient in the same two respects. To start, Kapitalforeningen does not plausibly allege that the specific "contrary facts" it describes were ever communicated to Defendants or accessible to them. And equally critically, even if the information reached Defendants, there are no plausible allegations that the information was contrary to public statements in light of UTC's size and structure.

To address the allegations pertaining to Otis first, there are no allegations that any of the exclusively Chinese-based Former Employees' knowledge about construction market slowdowns, Fake orders, or Specially-Approved orders were communicated to any Executive Defendant. There are only generic statements that information was "reported to Otis management" (Second Amended Complaint ¶ 80) and that "senior management" had access to sales data (id. ¶ 81). There are no descriptions of when these reports would have been provided to the Executive Defendants, what they contained, or on what systems they existed. These generic statements fall far short of the requirements of Rule 9(b).

The allegations against UTAS, albeit stronger, also fail to plead scienter sufficiently. No Former Employee is alleged to have circulated a report on the UTC's alleged difficulties directly to any Executive Defendant. There is no compelling allegation that any Former Employee: attended a meeting with any Executive Defendant or even with an immediate subordinate of any Executive Defendant discussing commercial aftermarket difficulties; received the revised targets back directly from the Executive Defendants; or had insights on all commercial aftermarket sales across UTAS divisions.

Instead, Kapitalforeningen alleges that the Former Employees' superiors (employed two or three levels above the Former Employees) conveyed the Former Employees' concerns within aggregated reports concerning larger business divisions and units. These allegations are inherently not derived from Former Employees' "personal knowledge" as required. Levy v. Maggiore, 48 F. Supp. 3d 428, 443 (E.D.N.Y. 2014) ("Plaintiff is only required to show that the source of the belief is someone in a position to have had personal knowledge."); see also Novack, 216 F.3d at 314.

FE 6 is the Former Employee that was closest to the process for generating sales targets on a UTAS-wide level. He created aftermarket services sales targets allegedly reflecting the difficulties UTC never disclosed. These

47

targets were eventually presented to Gitlin, but only after two or three levels of interim review, and at a meeting FE 6 was not present for. There was therefore no direct reporting of the information from FE 6 to any Defendant similar to the reporting that existed in Cornwell. See 689 F. Supp. 2d at 637-39.

Then, even if the sales difficulties had reached Gitlin as part of the projected targets, the allegations do not show the projections themselves contained specific "contrary facts." That is, it is unclear whether the projections themselves consisted strictly of numerical targets or descriptive causal information alerting Gitlin and the others about the difficulties with Boeing's partnership program or counterfeit parts, for example.

More critically, Kapitalforeningen also equivocates about what comprises "commercial aftermarket sales." For example, FE 6's projections pertained to "Aftermarket Services sales growth" as part of the "Aftermarket Services team." (Second Amended Complaint ¶¶ 61, 63, 64.) (emphasis added) But, as Gitlin described, the "commercial aftermarket" consists of three separate buckets: spare parts, provisioning, and repair. (See Investor Call Transcript, June 15, 2015, at 8.) Despite this specificity contained in the Second Amended Complaint, and Defendants' comments about how

48

commercial aftermarket sales are separated, Kapitalforeningen
argues that FE 6's projections reflected the best that UTAS
aftermarket sales, as a whole, could reach. (Pl. January 30
Letter at 2.) This contention is a stretch, and an important
one. When accounting for this detail, it is unclear how FE
6's projections of "low to mid-single digit growth" in
aftermarket services is a meaningful "contrary fact" from
Defendants' directionally similar guidance of "high single
digit" growth for UTAS in overall commercial aftermarket
sales.

        There are similar deficiencies with FE 1's descriptions
of monthly SIS Operational Review meetings and the SIS
business plan targets for 2015. (See Second Amended Complaint
¶¶ 49-51.) Like FE 6, FE 1 was not present for any of the
briefings to Defendants about the trends his team discussed.
Thus, even though FE 1 identified specific issues pertaining
to commercial aftermarket sales, such as airlines stockpiling
inventory, worked them into his projections and discussed
them with colleagues, it is not alleged with particularity
how those specific issues were reported up the chain.

        Even if the projections had been reported upward, as
Defendants rightfully point out, FE 1 and the other Former
Employees directly supporting FE 1's allegations worked
mainly within a single UTAS unit, so they had no insight on

how other UTAS units, let alone other UTAS divisions, projected aftermarket sales. See Rombach, 355 F.3d at 174 ("[I]t is wholly unclear why data relating to four facilities can be deemed representative of defendants' 115 other facilities, or material to the company's overall financial condition."). There could well be differences among units and divisions year-to-year. Indeed, UTC itself reported that commercial aftermarket sales were down within one subdivision but up in another in the same period during its 2014 earnings call. (Earnings Call Transcript, January 26, 2015 at 2.) Thus, these allegations do not support the existence of "contrary facts" available to Defendants, given the limited insight these Former Employees had into UTAS as a whole.

To circumvent this deficiency, Kapitalforeningen relies on FE 1's reports that ICAMS was the "largest component of" SIS and SIS contributed either 75% of UTAS's profit or "at least had to have been a major contributor" of UTAS's profits. (Id. ¶ 39.) There are two problems with this maneuver. One is that the "largest component" of "a major contributor" is a vague allegation that undermines how representative FE 1's observations are. That is, even if ICAMS is a major part of SIS and SIS is a major component of UTAS's overall profits, that does not mean ICAMS or SIS makes up a major part of UTAS's commercial aftermarket sales or profits. Second, as

Defendants point out, FE 1's reports about 12-15% declining commercial aftermarket profits in ICAMS are inconsistent with UTAS's rising profits in commercial aftermarket sales overall at the time, as reported in UTC's SEC filings. Although the Court does not rely on these judicially noticed filings for the truth of their contents, Sharette, 127 F. Supp. 3d at 75, it is notable that Kapitalforeningen does not contend that UTC's reporting or accounting is inaccurate or otherwise question Defendants' assertions about its historical performance.

FE 1's other comments do not support a strong inference of scienter. For example, without more information on the sources, the Court does not credit the allegation that FE 1 heard from a supervisor that Bellemare fought with another senior manager "about the unrealistic FY2015 targets." (Second Amended Complaint ¶ 54.) Even if the Court credited the allegations, as Defendants point out, these third-hand comments fail to specify what about the targets the senior manager argued was unrealistic, and if they pertained to the issues FE 1 identified.

Additionally, the fact that some forecast data was available on UTC systems does not salvage the scienter allegations. FE 4 allegedly placed Kidde's forecast data into the Hyperion Financial Management System, which consolidated

"all of UTC's financial data from around the world." (Id.
¶ 94.) Kapitalforeningen never describes what the "forecast
data" contains in terms of specific "contrary facts" that
would be available to Defendants. Similarly, even if
generically-described sales reports were aggregated and
provided to management during the Class Period, the Second
Amended Complaint would still suffer from pleading
deficiencies. It is not enough for Kapitalforeningen to plead
that Defendants had access to data showing declining sales —
indeed Defendants shared that precise information with
investors during the Class Period. Instead, the reports would
need to provide information on the specific causes and issues,
upon which Kapitalforeningen relies, such as the practice of
pulling in sales. This is the fundamental problem with
Kapitalforeningen's focus on the practice of pulling in
sales: nowhere does the Second Amended Complaint allege that
this practice was ever raised with Defendants, and the lack
of specificity with which the practice is described does not
suggest it was so "widespread" or done at such a scale that
Defendants must have known about it, as was the case in
Cornwell.

    The limited allegations of Former Employees Two through
Five fare no better and do not bolster the other allegations.
Although there is consistency among the observations of the

52

difficulties in aftermarket commercial sales and aggressive business targets to make them seem like "widespread knowledge," the weight of these allegations is negated by the fact that the Former Employees all come from the same few units and mostly from the same division as FE 1. For example, FE 2, like FE 1, worked in SIS and never presented information about the difficulties directly to Defendants. (See Second Amended Complaint ¶¶ 45, 58, 59.) FE 4 and FE 5 also worked in the same division as FE 1, (id. ¶ 55) and never had contact with any of the Executive Defendants. Thus, the import of these allegations at most is limited to performance in certain smaller sections of UTAS rather than the subdivision as a whole.

### 3. Competing Inferences

Of course, when assessing scienter, the Court must consider the evidence in its totality, and also consider all plausible opposing inferences. See Tellabs, 551 U.S. at 323. In determining whether a complaint has pleaded factual allegations giving rise to a strong inference of scienter, "[a] court . . . must assess the complaint in its entirety, and not scrutinize each allegation." Employees' Ret. Sys., 794 F.3d at 305.

Here, many of the allegations, such as those pertaining to Hayes's alleged admissions or Defendants' motives, fail to

support Kapitalforeningen's claims. The remaining allegations pertain exclusively to what the Former Employees reported. Although the reports among the Former Employees share consistent traits, the Former Employee's limited vantage point and lack of interaction with the Executive Defendants preclude those allegations from clearing the scienter hurdle. Ultimately, the allegations narratively describe management's misses and a lack of communication. This competing inference is supported by the Former Employees' statements and Executive Defendants' contemporaneous comments. Hayes made clear that although he "pushed the UTAS guys" to have larger numbers, in fact, it was the ultimately the "UTAS guys" who "had to push the aftermarket guys." (Second Amended Complaint ¶ 116.) The Former Employees consistently received the revised targets from superiors below Defendants, and then with those targets in hand worked with their teams to determine how to meet them — without Defendants' input. (See, e.g., id. ¶¶ 52, 59.)

This inference is also consistent with the allegation that FE 4 recalled that Keppy, not Defendants, would "bully" people to have them "make [their] number" or threaten to lose their job. (Id. ¶ 56.) In sum the stronger inference is that the Executive Defendants disclosed the difficulties with UTAS

and Otis once they learned about them and otherwise just
missed the 2015 targets.

### 4. Core Operations and Stock Buybacks

Kapitalforeningen's remaining allegations to support
scienter are easily addressed and dispensed with. First,
Kapitalforeningen incorrectly invokes the "core operations"
doctrine to argue that the "importance of UTAS to UTC's
financial results supports a strong inference of scienter."
(Id. ¶ 214.) Whether the "core operations doctrine survives
as a viable theory of scienter" after the passage of the PSLRA
remains debatable. In re Pretium Res. Inc. Sec. Litig., 256
F. Supp. 3d 459, 474 (S.D.N.Y. 2017), aff'd sub nom. Martin
v. Quartermain, 732 F. App'x 37 (2d Cir. 2018) (quoting
Frederick v. Mechel OAO, 475 F. App'x 353, 356 (2d Cir.
2012)). When applying the doctrine, "courts have required
that the operation in question constitute nearly all of a
company's business before finding scienter." Tyler v. Liz
Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011).
For example, UTAS is alleged to contribute only around 25% of
UTC's profits as a whole — and commercial aftermarket sales
are even less than that.

Next, Kapitalforeningen argues that Defendants initiated
billions of dollars of stock buyback during the Class Period
to "prop up" UTC's reported earnings per share to "conceal

55

UTC's inability" to meet the guidance. However, again, on the contrary, "substantial share repurchases" tend to "negate a finding of scienter" because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated. See Retirement Bd. of the Policemen's Annuity v. FXCM Inc., No. 15 Civ. 3599, 2016 WL 4435243, at *7 (S.D.N.Y. Aug. 18, 2016), vacated and remanded on other grounds, 693 F. App'x 77 (2d Cir. 2017) (citing Tyler, 814 F. Supp. 2d at 337-38). Moreover, other than the fact of the buyback itself, there are no particularized allegations that Defendants engaged in the buyback to "prop up" UTC's figures, such as emails discussing this strategy or meetings analyzing it.

### 5. Conclusion Regarding Scienter

In sum, the Court finds that no Executive Defendant made a misleading statement with sufficient degree of scienter. There are also no allegations regarding the scienter of any other corporate officer who is not a Defendant that could be attributed to UTC. The Section 10(b) claims against all the Executive Defendants and UTC are therefore dismissed. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008). With no primary Exchange Act violation, the Section 20 control person liability claims must also be dismissed. See ATSI Commc'ns Inc., 493 F.3d at 108.

## B. OPINION STATEMENT LIABILITY

As a second and alternative basis for dismissal, the Court finds that nearly all of the alleged misstatements are opinions that do not give rise to liability. For the few alleged misstatements that do not qualify as opinion statements, other reasons render them innocuous.

The standard for opinion statement liability is whether any omitted information makes the opinion statements "misleading to a reasonable investor" under the Supreme Court's Omnicare standard. Sanofi, 816 F.3d at 210. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts . . . [and do] not expect that every fact known to an issuer supports its opinion statement." Id. at 211 (internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" The omitted facts must "conflict with what a reasonable investor would take from the statement itself." Id. (internal quotation marks omitted). "[M]eeting the [Omnicare] standard . . . is no small task for an investor." Id. at 210.

Defendants categorize the alleged misstatements into two categories of opinion statements, and assert that every statement falls within one of those two categories. One

57

category comprises statements on UTC's 2015 projections. (Def. Memo at 21.) The other category consists of statements reaffirming those estimates. (Id.) Defendants argue the statements in both categories are "non-actionable opinions" because Kapitalforeningen has not adequately met the Sanofi test. (Def. January 23 Letter at 2.)

Kapitalforeningen concedes that certain statements are opinion statements. (Pl. January 30 letter at 2.) But it argues those statements meet the Omnicare and Sanofi standards due to the alleged omissions of material facts that make them misleading, and because Defendants allegedly made the statements with "no reasonable basis in fact." (See Pl. January 30 Letter at 2.) Kapitalforeningen also argues that certain statements are factual, non-opinion statements. (Id.)

As a threshold matter, the Court must decide whether the alleged misstatements are opinion statements or statements of fact. Kapitalforeningen concedes that numerous statements regarding future profitability are opinion statements. See Sanofi, 87 F. Supp. 3d at 531 ("expectations for the future" are opinions not "presently existing, objective facts"). However, Kapitalforeningen asserts that other statements are factual.

As the Court recognized in MF Global, the Second Circuit has not comprehensively delineated the difference between a

statement of opinion and a statement of fact. See In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 312 (S.D.N.Y. 2013) (classifying defendants' statements on certain accounting decisions as opinions due to a lack of a verifiable "objective standard"). However there are some clear benchmarks applicable to the majority of the statements at issue. "[E]xpressions of optimism [and] projections about the future" are typical types of opinion statements. In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998). For the remaining statements, the Court must assess whether they are verifiable on some objective standard. See MF Global, 982 F. Supp. 2d at 312.

### 1. Non-Opinion Statements

The Court first addresses the non-opinion statements. Kapitalforeningen argues many of the statements at issue are "non-opinion statements." (Pl. January 30 Letter at 2 (citing Second Amended Complaint ¶¶ 112, 122-24, 131, 138-40, 149).) The Court, however, finds that only two of the related statements are factual statements. In one Darnis is quoted as saying: "after several years of flat performance and declining share, Otis trajectory is trending positive." (Second Amended Complaint ¶ 112.) Next, Darnis is also alleged to have made a similar, more detailed statement later. (Id. ¶ 140.) Kapitalforeningen argues these statements are

misleading because Hayes "admitted" that "over the last 10 or 15 years," Defendants had "seen a continued erosion of Otis market share as we have pursued margin expansion," and Otis had "taken margin expansion to the point now where we're not terribly competitive based on new equipment pricing." (Id. ¶ 119.) Hayes also said that Defendants had "seen a big slowdown in China" regarding Otis. (Id.)

These few general lines about Otis do not support a finding of falsity sufficient to make Darnis's comments about Otis's trajectory misleading. Further, given UTC's many disclosures from the beginning of the Class Period about Otis difficulties in China, a reasonable investor would know how Otis was performing in China for the years beforehand. Thus, although Kapitalforeningen is correct that these are factual statements, the Court is not persuaded that they give rise to Section 10(b) fraud liability for Defendants.

The other statements Kapitalforeningen argues are non-opinion statements are in fact either opinion statements more fully addressed below or otherwise non-actionable puffery because they conveyed "no meaningful, objective data that an investor would rely upon." E.g., Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp., 300 F. Supp. 3d 551, 577 (S.D.N.Y. 2018) (internal quotation marks omitted). Some examples of this puffery include statements such as "our

business fundamentals and operational expectations have not changed." (Second Amended Complaint ¶ 122; see also id. ¶¶ 123, 139 (alleging similar misstatements regarding UTC's business "fundamentals".) For a company operating worldwide on billions of dollars of sales a year in multiple industries, it is unclear what information is conveyed by the reference to "fundamentals" that was ultimately false.

### 2. Opinion Statements

The remaining statements Kapitalforeningen cites, however, are opinion statements subject to the Omnicare test. This classification includes statements such as "[b]ased on solid backlog and continued orders strength, we see topline momentum as we enter 2015" (id. ¶ 122); "we still expect . . . high single-digit growth in the aftermarket at UTAS" (id. ¶ 124); "we expect stronger commercial aftermarket in the second half of the year, primarily because provisioning is back-end loaded" (id. ¶ 138); UTC was "on the right track" (id. ¶ 131); "2015 is on track of what we said in January," and that "operationally, everything, as we expected, things [are] moving along exactly in line with what we thought" (id. ¶ 149).

Thus, for these types of statements, as well as the others in the Second Amended Complaint relating to expected future earnings that Kapitalforeningen concede are opinion

statements, the <u>Omnicare</u> test and its two options for when liability may attach to opinion statement applies.

i. <u>Option One: Actual Knowledge of Falsity or No Reasonable Basis in Fact</u>

Under the first option, Kapitalforeningen must allege with particularity that Defendants had actual knowledge of the falsity, or knew the statement did not "rest on some meaningful inquiry." <u>Omnicare</u>, 135 S. Ct. at 1325-28, 1332; <u>see also</u> <u>City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.</u>, 129 F. Supp. 3d 48, 72 n.155 (S.D.N.Y. 2015) (holding omission as misleading if the statement had "no reasonable basis in fact"). As discussed above with regards to scienter, Kapitalforeningen cannot show Hayes had actual knowledge of the falsity of any of these statements.

Instead, Kapitalforeningen relies heavily on this "no reasonable basis in fact" prong. (<u>See</u> Pl. January 30 Letter at 3.) Once again, the allegations can be separated as those pertaining to Otis versus those pertaining to UTAS.

For Otis, Kapitalforeningen does not allege that the Otis-related statements on the Chinese market slowdown, "order backlog," or "order strength" were made with no reasonable basis in fact. That is, there are no allegations about how Defendants evaluated China's slowdown or the order backlog, and even if the Court credits the weak allegations

about the Fake and Specially Approved orders, nothing links those allegations to Defendants' opinion statements about Otis China's performance. The Court also notes that Defendants disclosed the numerous difficulties about Otis in the Chinese market throughout the Class Period.

Next, Kapitalforeningen argues that Hayes admitted that his prior statements about UTAS's profitability had no basis in fact. Kapitalforeningen specifically points to Hayes's statements on the July 21, 2015 earnings call that "I don't think there was a strong basis in that aftermarket assumption around how we were going to get there." (Pl. January 30 Letter at 2-3 ("Defendants have admitted that their assumption of continued growth in 2015 lacked any factual basis.").) Kapitalforeningen's reliance on this statement ignores that even taking it at face value, Hayes's statement is that there was not a "strong basis" — which is not the same as "no reasonable basis," which is the standard for opinion statement liability.

But this statement cannot be taken at face value. For one, as explained earlier, Hayes is clearly speaking retrospectively with the benefit of hindsight, and not stating that he knew at the time there was no reasonable basis for UTC's projections. Additionally, on the same call, Defendants described the basis for the earlier opinion. Hayes

and Johri explained in the call that the projections were based on sales from the year before as well as projections from airlines' plans. (See Earnings Call Transcript, July 21, 2015, at 8-9.) Although the Court cannot accept these contemporaneous statements for their underlying truth, they provide important context for the alleged admissions. Further, while Kapitalforeningen cannot plead what happened during the meetings to discuss the 2015 targets, the Second Amended Complaint is replete with detail about the process demonstrating the "meaningful inquiry" that went into crafting such targets. Sanofi, 816 F.3d at 214.

The Former Employees' recounting of that process and managements' revisions ignoring "negative trends" also do not show that the statements were made without a reasonable basis in fact. Indeed, for the same reasons why there are no "contrary facts" to support the scienter allegations, Kapitalforeningen points to no specific facts to show that UTC's ultimate projections were unreasonable in light of the information obtained by Defendants.

The opinion statement liability cases that Kapitalforeningen points to illustrate the high bar required to allege Defendants had "no reasonable basis" for their opinion statements. The court in Westland Police and Fire Retirement System found that plaintiffs did not adequately

allege that there was "no reasonable basis" for the defendant's opinion because they "alleged no facts whatsoever regarding the basis for [defendant's] opinion." 129 F. Supp. 3d at 82. Here, even though Kapitalforeningen generally alleges that Defendants ignored employees' advice, Kapitalforeningen provides no allegations that Defendants had sufficient knowledge about the Former Employees' statements or demonstrating whether Defendants interpreted and considered the Former Employees' recommendations.

Kapitalforeningen also points to another case which does not involve opinion statements at all, see Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 230 (S.D.N.Y. 2008) (briefly touching upon "a reasonable basis" in the context of scienter), and another case that states the rule but its analysis focuses strictly on whether defendants "did not actually believe" their statements. In re Lehman Bros. Sec. & Erisa Litig., 131 F. Supp. 3d 241, 255 (S.D.N.Y. 2015).

In sum, there are no specific allegations to support Kapitalforeningen's argument that the guidance Defendants offered about UTC was made with no reasonable basis in fact.

ii.  Option Two: Misleading Omissions

The second way to meet the Omnicare standard is to show that Defendants' opinion statements omitted information that

"makes the statement misleading to a reasonable investor."
Sanofi, 816 F.3d at 210.

One unsettled issue is how the Court is to weigh the materiality of some omitted "fact cutting the other way" under the elevated Omnicare standard for opinion statements. Generally, "materiality is typically a fact-intensive endeavor ill-suited for resolution on a motion to dismiss." E.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811 (2d Cir. 1996). Sanofi and other recent cases provide some guidance on when those facts require disclosure.

In Sanofi, the defendants made optimistic statements estimating that the Food and Drug Administration ("FDA") was 90% likely to approve a new drug within a certain timeframe. 816 F.3d at 211. When making that statement, the defendants did not disclose some non-dispositive negative guidance from the FDA about whether the agency would, in fact, approve the drug within the timeframe. Id. Eventually, the drug was approved, but only after the timeframe. Id. at 208. The Court of Appeals found that the defendants' statements about the expected drug approval were optimistic expressions of opinion, especially in light of "caveats" made in the offering materials about FDA approval. Id. at 211.

The Court of Appeals also analyzed omissions from opinion statements in another post-Omnicare case involving the goldmining industry. See Martin v. Quartermain, 732 F. App'x 37 (2d Cir. 2018). The defendant goldmining company hired a consultant to "estimate the quantity of gold" that could be produced from a mining site. See id. at 39. The preliminary analysis was positive and the consultant recommended that the goldmining company test some samples to confirm its results. Thus, the goldmining company hired a testing company to both test samples and issue a report after processing all the data. During the sampling process, the goldmining company "reported favorable results" despite receiving negative and contrary interim reports about the samples from the testing company. Id. The testing company never completed its analysis or issued a final report. Eventually, the goldmining company released the negative interim reports and its stock fell 30%. The Court of Appeals held that, again especially in light of the disclosures and volatility of the industry, the original optimistic comments were not misleading. Id. at 41. That is, the goldmining company was not required to release the interim reports along with its optimistic statements, as it hired the sampling company to issue only a final report.

Between Sanofi and Martin, it is clear that omitting
even significant, directly contradictory information from
opinion statements is not misleading, "especially" when there
are countervailing disclosures. With that standard in mind,
the Court addresses the parties' arguments.

Here, the alleged omissions are (1) the various factors
leading to the slowdown of commercial aftermarket sales and
culminating in business units' lower projections; (2) the
practice of pulling in sales from future periods; and (3) the
Fake and Specially Approved Otis orders. (See, e.g., Second
Amended Complaint ¶¶ 117, 118, 120, 130.)

Starting with the third category, the Otis related
allegations are too scant in detail and scope to support
allegations that investors should have been informed about
them. Specifically, the allegations provide essentially no
details on the scope of the practice of Fake and Specially
Approved orders, and there are no plausible allegations
providing context that the practice played any part in Otis
missing its growth target.

Continuing in reverse order, the practice of pulling in
sales is also described at a high level such that the scope
and impact of it are not alleged well enough to show it would
be misleading to withhold the information from a reasonable
investor — certainly not to the level that test data was

in Sanofi and Martin. Kapitalforeningen points to Murphy v. Precision Castparts Corp., 16 Civ. 521, 2017 WL 3084274, at *9 (D. Or. June 27, 2017), which held that the defendant's failure to disclose its aggressive pulling in strategy was actionable. However, the practices there were described at a much deeper level and the materiality was inextricably linked with a change in policy by a major customer that critically hindered pulling in future sales. Moreover, as discussed further below, here there were frank warnings about the commercial aftermarket numbers in the latter half of the Class Period once Defendants began reporting interim numbers.

The Sanofi and Martin cases also provide the reasoning for why the omissions about the factors leading to the slowdown of commercial aftermarket sales do not make the opinion statements about UTAS's profitability misleading. Once again, the severity or scope of the problems are not described in sufficient detail and certainly do not rise to the significance of the omissions in Sanofi and Martin. For example the omission of information that "commercial primes began stockpiling in additional parts . . . . [Which] resulted in lower aftermarket sales and profits" provides no detail as to the scope of the problem. (Second Amended Complaint ¶ 40; see also id. ¶ 44, 46 (describing counterfeit sales and

airlines' pooling buying powers as generically impacting profits).)

As another example, Boeing launched a partnership cost-saving program that was allegedly implemented years before the Class Period 2012. Kapitalforeningen does not explain why that two-year-old program newly impacted UTAS in the Class Period, or, more fundamentally, how Boeing's component price hike negatively impacts UTC's commercial aftermarket sales. By virtue of being "aftermarket" sales, UTC's commercial aftermarket sales are not principally to Boeing, but to Boeing's customers, such as airlines. (See "UTC Form 10-K, dated February 5, 2015," Dkt. No. 43 Ex. 1 at 11 (describing risks to "component aftermarket parts and service" based on decisions by commercial airlines — not manufacturers).) Thus again, without additional allegations on how Boeing's program impacted UTC's aftermarket sales, there is no way to assess the omission of that program in the context of Sanofi and Martin.

Finally, the Court recognizes that as early as March 12, 2015, Defendants provided numerous details about how commercial aftermarket sales were a "watch item" and that sales and orders were weaker than expected. (See Investor Call Transcript, March 12, 2015, at 12.) These disclosures especially render any optimistic opinion statements as

insufficiently misleading to satisfy the <u>Omnicare</u> standard, even recognizing that analysts were surprised by the guidance in July 2015. (<u>See</u> Second Amended Complaint ¶ 5.)

For all these reasons, the Second Amended Complaint fails to sufficiently allege omissions that would make any of UTC's statements about its future performance misleading to the reasonable investor.

## C. SAFE HARBOR

UTC also argues that the alleged misstatements are protected by the PSLRA's safe harbor and the common-law "bespeaks caution" doctrine for forward-looking statements. (<u>See</u> Def. Memo at 15-27.)

Many of the statements at issue are likely protected by the safe harbor and thus subject to an even higher threshold to plead scienter that the Second Amended Complaint does not meet. Even so, courts in the Second Circuit have consistently held "that neither the PSLRA safe harbor nor the bespeaks-caution doctrine protects material omissions." <u>See, e.g.</u>, <u>Wilson v. LSB Indus., Inc.</u>, No. 15 Civ. 7614, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017). UTC never addressed this issue, but as discussed above, many of the allegations in the Second Amended Complaint concern the alleged omissions of material information. Because the Court is dismissing the Second

Amended Complaint on alternative grounds, it will not evaluate this defense further.

## IV. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the renewed motion to dismiss (Dkt. Nos. 41, 48) filed by United Technologies Corp., Gregory Hayes, Akhil Johri, and Alain Bellemare to dismiss the second amended complaint in this case is **GRANTED**.

**SO ORDERED.**

Dated:     New York, New York
           28 September 2018

                                    Victor Marrero
                                    U.S.D.J.